12-3867 (L)
*Terebesi v. Torresso, et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2013

(Argued: October 10, 2013      Decided: August 21, 2014)

Docket No. 12-3867
(consolidated with 12-3868, 12-3870, 12-3898, 12-3903,
12-3990)

RONALD TEREBESI,

*Plaintiff–Appellee,*

- v -

SERGEANT JAY TORRESO, SERGEANT STEPHEN
BRENNAN, OFFICER GREGG PHILLIPSON, CHIEF
JOHN F. SOLOMON, LIEUTENANT RONALD KIRBY,
SERGEANT KENNETH JONES, OFFICER WILLIAM
RUSCOE, OFFICER BRIAN WEIR, OFFICER TODD
EDWARDS, OFFICER GREGG LEE, SERGEANT MARK
CIRILLO, OFFICER MICHAEL SWEENEY, all
individually and in their official capacities as police
officers,

*Defendants–Appellants.*[*]

---

[*]   The Clerk of the Court is respectfully directed to amend
the official caption to appear as set forth above.

1

Before:       SACK, CHIN, and DRONEY, *Circuit Judges*.

Appeal from an order of the United States District Court for the District of Connecticut (Janet Bond Arterton, *Judge*) granting in part and denying in part the defendants' motions for summary judgment based on their assertions of qualified immunity.   With respect to the claims that are properly before us on this interlocutory appeal, we affirm the decision of the district court, except as to one claim of qualified immunity, which we conclude to be meritorious and as to which we therefore reverse.   Because we conclude that many of the defendants' arguments turn on disputed allegations of fact, we dismiss these aspects of the appeal for lack of appellate jurisdiction.   To the extent that the appellants maintain on appeal any state-law arguments that do not pertain to federal qualified immunity, they also are dismissed for lack of jurisdiction.

RICHARD J. BURTURLA, Berchem Moses & Devlin, P.C., Milford, CT, *for Defendant–Appellant Michael Sweeney*.

ARTHUR C. LASKE, III, Laske Law Firm, LLC, Fairfield, CT, *for Defendants–Appellants Ronald Kirby, Kenneth Jones, William Ruscoe, Brian Weir, Todd Edwards, and Gregg Lee*.

CATHERINE S. NIETZEL, Ryan Ryan Deluca LLP, Stamford, CT, *for Defendant–Appellant John Solomon*.

ELLIOT B. SPECTOR, Noble, Spector & O'Connor, P.C., Hartford, CT, *for Defendant–Appellant Mark Cirillo*.

2

Thomas R. Gerarde, Beatrice S. Jordan, Howd & Ludorf, LLC, Hartford, CT, *for Defendants– Appellants Stephen Brennan and Gregg Phillipson*.

Scott M. Karsten, Karsten & Tallberg, LLC, West Hartford, CT, *for Defendant–Appellant Jay Torreso*.

GARY A. MASTRONARDI, Law Firm of Gary A. Mastronardi (John R. Gulash, Gulash & Riccio, *on the brief*), Bridgeport, CT, *for Plaintiff–Appellee Ronald Terebesi*.

SACK, *Circuit Judge*:

This case arises out of a botched SWAT[1]-style raid in Easton, Connecticut, in 2008. The police obtained a warrant to search the home of the plaintiff, Ronald Terebesi, for a small amount of crack cocaine and drug paraphernalia. To execute the search, police planned to smash Terebesi's windows, detonate at least three stun grenades (or "flashbangs") inside the home, break down the front door with a battering ram, and storm the house with weapons drawn. In the chaos that accompanied the implementation of this plan, the officers fatally shot Gonzalo Guizan, Terebesi's houseguest, and allegedly injured Terebesi. Both of the occupants were unarmed, and no weapons were found in the house.

---

[1] SWAT is the acronym for "Special Weapons and Tactics." *See, e.g.*, Alan D. Cohn, *Mutual Aid: Intergovernmental Agreements for Emergency Preparedness and Response*, 37 Urb. Law. 1, 45 (2005).

3

In 2009, Terebesi and Guizan's estate brought suit against the officers involved in planning and executing the raid, against the police chiefs of several municipalities whose officers were involved, and against the municipalities themselves, alleging, *inter alia*, civil rights violations under 42 U.S.C. § 1983 and associated state tort claims. On December 29, 2011, the defendants moved for summary judgment, asserting that the facts of the case and the doctrine of qualified immunity rendered all of the plaintiffs' claims unsustainable. The District of Connecticut (Janet Bond Arterton, *Judge*) granted the motions in part and denied them in part. The defendants appeal from the denial of summary judgment. On April 11, 2013, Guizan's estate notified this Court of a settlement with all defendants, and the estate is no longer a party to this appeal.

For the reasons set forth below, we AFFIRM in part the order of the district court, REVERSE in part, and DISMISS the remainder of the claims for lack of appellate jurisdiction.

## BACKGROUND

On interlocutory appeal, after the denial of the defendants' motions for summary judgment, "we have jurisdiction to review a denial of qualified immunity to the extent it can be resolved 'on stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996)). We proceed to recite the factual basis of our decision in light of this limitation.

4

**Police Interactions with Terebesi**
**Prior to the Raid**

In the weeks leading up to the raid on Ronald Terebesi's house in Easton, Connecticut, local police interacted with him on at least four occasions. Because the defendants assert that these interactions justify the tactics they employed in the raid, we recount them in some detail.

On March 31, 2008, at about 2:00 a.m., Officer Christopher Barton of the Easton Police Department was dispatched to Terebesi's home in response to a 911 call reporting that a man was having a seizure. Incident Report, Ex. C to Defs.' Local Rule 56(a)(1) Stmt., No. 3:09-cv-01436, ECF No. 199 ("Incident Report"). After knocking on the door several times with no response, Barton and his partner entered the residence, found Terebesi sleeping, and shook him awake. Dep. of Christopher Barton at 18, Ex. B to Defs.' Local Rule 56(a)(1) Stmt., No. 3:09-cv-01436, ECF No. 199 ("Barton Dep. I"). Easton Emergency Medical Services personnel were also on the scene. Incident Report, at 1. Although Terebesi was surprised and asserted that he had not called 911, he was not confrontational and offered no resistance as the officers and medical personnel lifted him up from his sofa to reveal three glass-stem pipes and a loaded .357 caliber Smith & Wesson pistol. Dep. of Officer Christopher Barton at 21, 26–27, Ex. 1 to Guizan's Local Rule 56(a)(2) Stmt., No. 3:09-cv-01436, ECF No. 212, ("Barton Dep. II"); Incident Report, at 1.

Terebesi told the officers that he kept the handgun for his personal safety and protection, and that he had been receiving threatening messages from "a pimp." Guizan's Local Rule 56(a)(2) Stmt., Part I, ¶ 19, J.A. 305 (citing Terebesi's deposition). Barton "seized the gun

5

for safekeeping," and told Terebesi he would have to go to the police station to pick it up. Barton Dep. II, at 30. Nothing of which we are aware in the record suggests that Terebesi retrieved the gun from the police station any time thereafter or, in any event, before the events of May 18, 2008.

As a result of the incident of March 31, Easton Police obtained a warrant for Terebesi's arrest, and Barton and a colleague served the warrant at Terebesi's home. Guizan's Local Rule 56(a)(2) Stmt., Part I, ¶ 22, J.A. 306. Terebesi went with the officers to the Easton police station without incident. *See id.*, ¶¶ 22–28, J.A. 306–07. While he was preparing to leave his home, Terebesi asked the officers how long he would be gone, expressing concern about leaving his pet macaw unattended. Aff. of Ronald Terebesi, ¶ 16, J.A. 284–85. Later, in a conversation during the ride to the police station, Terebesi told Barton that he owned a nine-millimeter Beretta pistol, which he considered to be a collector's item and which he kept in a display case at his parents' house in nearby Trumbull, Connecticut. *Id.* ¶ 19(b), J.A. 286. A subsequent records check revealed that Terebesi had registered such a pistol in 1990. Guizan's Local Rule 56(a)(2) Stmt., Part II, ¶ 4, J.A. 370. After being booked, Terebesi was released without bond on a promise to appear. *Id.* ¶ 6, J.A. 370. Officers drove him home, unrestrained, in the back of a police car. *Id.*, J.A. 370–71 (citing Barton Dep. II).

On May 7, 2008, at about 4:00 a.m., an unidentified person or persons attacked Terebesi's residence, firing seven blasts from a shotgun through the windows of the house. Guizan's Local Rule 56(a)(2) Stmt., Part I, ¶ 29, J.A. 307. Terebesi, who had been on the couch watching television, crouched down and ran into the bedroom, where he stayed until police arrived. Aff. of Officer David Simpson ¶¶ 6–11, J.A. 168. After

6

the shooting, Barton and John Solomon, the Chief of the Easton Police, spoke with Terebesi regarding the incident. Although Terebesi agreed to answer their questions, they found his responses to be unhelpful or, in their view, untruthful. *See* Dep. of John Solomon at 166–69, Ex. G to Defs.' Local Rule 56(a)(1) Stmt., No. 3:09-cv-01436, ECF No. 199 ("Solomon Dep."); Barton Dep. I at 178–79, 190. *Id.* Later that day, Barton convinced Terebesi to return to the police station to give a statement. Barton Dep. II, at 51.

The following day, as police investigated the shotgun attack, an acquaintance of Terebesi told police that Terebesi used crack cocaine daily. Written Stmt. of Tina T. Lamica at 3, May 8, 2008, J.A. 181–83. Then, on May 17, 2008, a neighbor complained to police that she had discovered a bag containing hypodermic needles in the neighborhood, and that she had observed "a steady flow" of traffic in and around Terebesi's house at odd hours. Barton Dep. II at 65–66; Dep. of James Candee at 173–74, J.A. 188.

Barton responded to the neighbor's complaint and proceeded to Terebesi's residence to speak with him. *Id.* at 66. He found the house "barricaded," with the windows covered. *Id.* at 72–73; *see also* Witness Stmt. of Sergeant Mark Cirillo, J.A. 208 (describing the windows as covered with plywood and blankets). After knocking on the door and receiving no answer, Barton returned to the police station and telephoned Terebesi instead. *Id.* at 67. Terebesi denied knowing about the bag of needles. *Id.* at 68. Chief Solomon later testified that the Easton Police had had no other reports of drug-related activity in the neighborhood. Solomon Dep. 520, J.A. 175.

**Planning of the May 18 Raid**

*The Warrant and Tactical Team Activation*

At about 9:00 a.m. on the morning of May 18, a woman named Chandra Pankov told police that she had been at Terebesi's house, and that she had personally witnessed the use of a small quantity of drugs there. Barton Dep. II at 117; Search and Seizure Warrant, in J.A. 417–23. Chief Solomon ordered that a search warrant be prepared and served that day. Solomon Dep. 279. And he requested that the Southwest [Connecticut] Regional Emergency Response Team ("SWERT")[2] be activated in order to assist in serving the warrant. *Id.* at 284. At 11:34 a.m., the Superior Court granted a search warrant for two "small clear glass smoking pipes" and "[c]rack cocaine in a tin box." Search and Seizure Warrant, in J.A. 417–23. Witnesses could not remember another time that SWERT had been activated to seize a personal-use quantity of drugs. *See* Dep. of Michael Sweeney at 61–63, Ex. 26 to Guizan's Local Rule 56(a)(2) Stmt., No. 3:09-cv-01436, ECF No. 212 ("Sweeney Dep."); Dep. of Thomas Kiely at 23, Ex. 34 to Guizan's Local Rule 56(a)(2) Stmt., No. 3:09-cv-01436, ECF No. 212.

---

[2] SWERT is a specialized tactical police unit formed pursuant to a Mutual Aid Compact among the Connecticut towns of Easton, Trumbull, Monroe, Darien, Wilton, and Westport. J.A. 142–45; *see also* Conn. Gen. Stat. § 7-277a (setting out a framework for these mutual agreements). SWERT is intended to deploy specially trained police officers "to any incident involving tactical operations, manmade or natural disaster, search and rescue, dignitary protection, civil unrest, or any situation requiring immediate augmentation of local law enforcement personnel to preserve life and protect property." SWERT Mutual Aid Compact Addendum, J.A. 142.

*The Briefing*

The SWERT team was fully assembled for a briefing on the operation at about 1:00 p.m. *See* Sweeney Dep. at 224. The officers were informed that the items to be seized were two glass pipes and a tin box containing narcotics. Dep. of Captain James Candee at 140, Ex. 2 to Pl. Rule 56(a)(2) Stmt., No. 3:09-cv-01436, ECF No. 212. Solomon told the team that Terebesi was a habitual user of crack cocaine, and that he had been the target of a shotgun attack on May 7. Guizan's Rule 56(a)(2) Stmt., Part I, ¶¶ 106–07, J.A. 325. Barton, who signed the search warrant application but did not participate in the raid, also spoke to the SWERT team about his previous interactions with Terebesi. *Id.* ¶¶ 113–15, J.A. 327.

Throughout the course of this litigation, the SWERT team defendants have emphasized in their defense three statements made in the course of the briefing. First, Terebesi's house was described as having been "fortified" since the May 7 shotgun attack, although these fortifications amounted only to plywood affixed to the shot-out windows and hanging blankets to "catch" any shotgun pellets. Witness Stmt. of Sergeant Mark Cirillo, J.A. 208. Second, Barton told the team about "the unaccounted for Beretta that was out there," referring to the pistol that Terebesi said he kept at his parents' house. Barton Dep. II, at 141–42. The other officers may not have known that the pistol was not kept in Terebesi's home. Finally, several defendants report being told that Terebesi would "use force to protect his pet bird," Br. of Ronald Kirby *et al.*, at 10, or that "he would defend this bird to the death," Br. of Mark Cirillo, at 13. Barton testified that he told the assembled SWERT team that Terebesi had expressed an unusual devotion to his bird, but denied saying that Terebesi "would fight to the death or he would attack an intruder

9

over the well-being of his bird."[3]   Barton Dep. II, at 141–144.

*The Raid Plan*

The plan for serving the warrant was developed by Officer William Ruscoe and Sergeant Kenneth Jones of the Trumbull Police Department and by Sergeant Mark Cirillo of the Darien Police Department.   Pl. Rule 56(a)(2) Stmt., Part I, ¶ 124, J.A. 329–30.   Lieutenant Ronald Kirby, of the Trumbull Police, acted as the commander of the SWERT team and reviewed and approved the plan.   *Id.*   The plan also was subject to the ultimate approval of John Solomon, who, as the Easton Chief of Police, was the highest-ranking local law enforcement official involved in the Terebesi matter. *Id.*; *see also* SWERT Mutual Aid Compact Addendum, J.A. at 143 ("The Team shall not commence any operation without the authorization of the ranking local law enforcement official at the scene.").

The plan called for a team of three officers to approach the rear of the house and toss two stun grenades[4] through a rear window.   Witness Stmt. of Officer William Ruscoe, J.A. 197–202**.**   This would be

---

[3] Barton recalls Terebesi saying, during his arrest for the March 31 incident: "[T]hat bird's my life.   I would do anything that I needed to protect that bird."   Barton Dep. II, at 143.

[4] The grenades used by the defendants go by a variety of names, including "flash grenade," "stun grenade," "concussion grenade," "distraction device," and the colloquial "flashbang."   *See, e.g.*, Al Baker, *The 'Flash Bangs' Are Stilled*, N.Y. Times, Feb. 4, 2010, http://cityroom.blogs.nytimes.com/ 2010/02/04/the-flash-bangs-are-stilled/.   They "produce[ ] a brilliant flash and a loud noise designed to stun and disorient persons nearby, making resistance less likely."   *United States v. Jones*, 214 F.3d 836, 837 (7th Cir. 2000).

the first time SWERT had ever used stun grenades in an operation.   Guizan's Rule 56(a)(2) Stmt., Part II, ¶ 88, J.A. 395.   Another group of officers would knock loudly at the front door, announce their presence, and then, if necessary, break the door down with a battering ram. Witness Stmt. of Officer William Ruscoe, J.A. 197–202. After the door was breached, one team member would toss in another stun grenade, and a group of officers would rush in and restrain anyone in the house.   *Id*. Police refer to this kind of raid (euphemistically) as a "dynamic entry."   *See generally* Karan R. Singh, Note, *Treading the Thin Blue Line: Military Special-Operations Trained Police SWAT Teams and the Constitution*, 9 Wm. & Mary Bill of Rts. J. 673, 682–83 (2001).

Not all the team members were satisfied with this plan.   Sergeant John Lawlor and Officer Michael Redgate told Mark Cirillo that a dynamic entry was too dangerous for a drug warrant.   Dep. of John Lawlor at 32–34, Ex. 9 to Guizan's Local Rule 56(a)(2) Stmt., No. 3:09-cv-01436, ECF Doc. No. 212 ("Lawlor Dep."); Dep. of Michael Redgate at 33–35, Ex. 8 to Guizan's Local Rule 56(a)(2) Stmt., 3:09-cv-01436, ECF Doc. No. 212; Dep. of Mark Cirillo at 146, Ex. 17 to Guizan's Local Rule 56(a)(2) Stmt., No. 3:09-cv-01436, ECF Doc. No. 212; Witness Stmt. of Sergeant Mark Cirillo, J.A. 209.   Lawlor testified that Cirillo attempted to have the plan changed, but did not succeed.   Lawlor Dep. at 34, 47; *see also* Witness Stmt. of Sergeant Mark Cirillo, J.A. 209.

**The Raid**

The operation began at about 2:00 p.m. on May 18, 2008.   Throughout the short raid and its aftermath, Lieutenant Ronald Kirby recorded a video of the event from the exterior of the home.   Although little can be seen of the raid from that viewpoint, the recording purportedly contains a complete audio record of the

raid, including the successive stun grenade detonations and a series of gunshots.

At the beginning of the operation, Sergeant Jay Torreso, of the Monroe Police, and Officer Gregg Phillipson and Lieutenant Stephen Brennan, of the Wilton Police, moved to the rear of the house. *See* Guizan's Local Rule 56(a)(2) Stmt., Part II, ¶¶ 116–119, J.A. 403. Phillipson broke a window and separated the curtains inside, allowing the other officers to toss their stun grenades into the house. *Id.* ¶ 117, J.A. 403. Either immediately before or at the same time as the first stun grenade detonated, Brennan began shouting, "Police! Police with warrant! Hands up!" *Id.*, ¶¶ 113, 119, J.A. 402–03.

Meanwhile, the other team members moved to the front door and announced their presence. *Id.* ¶ 123, J.A. 404. The parties dispute what happened next. The defendants assert that Officer Gregg Lee checked to see whether the door was locked, knocked on the door and announced the officers' presence, and then waited several seconds for the occupants to respond before Officer Todd Edwards breached the door. Defs.' Local Rule 56(a)(1) Stmt., ¶ 148, J.A. 133. But the plaintiffs pointed out that only 7.194 seconds[5] elapsed between the detonation of the second stun grenade, which was thrown from the rear of the house, and the detonation of the third stun grenade, which would have been thrown by the front-entry team after breaching the door. Guizan's Local Rule 56(a)(2) Stmt., Part II, ¶ 124, J.A. 404. Because a stun grenade takes 1.5 seconds to detonate, the plaintiffs argued, the front entry team had only 5.694 seconds to open the screen door, check to see whether

_____

[5] The timing is taken from time stamps on the video recording, which was prepared by the plaintiff's expert and which purports to provide times with that level of precision.

Terebesi's door was locked, knock, announce, wait for a response, breach the door, look inside the room, and then throw a stun grenade. *Id.* ¶¶ 124–25, J.A. 404.

The plan called for six officers to enter sequentially, most brandishing weapons and wearing body armor. Defs.' Local Rule 56(a)(1) Stmt., ¶¶ 152–56 162, J.A. 134–35, 137. Michael Sweeney of the Monroe Police was to enter the apartment first, wearing full ballistic body armor and a Kevlar helmet and carrying a ballistic shield and a Glock semiautomatic pistol. *Id*., ¶¶ 152, 162, J.A. 134, 137. Officer Brian Weir of the Trumbull Police would follow, carrying a rifle. *Id.* ¶ 153, J.A. 134. Officer Donald Allen would be third, followed by Officer Kenneth Jones, who would carry a Taser—a "less [than] lethal option." *Id.* ¶¶ 154–55, J.A. 134–35. Ruscoe and Cirillo, designated "team field leaders," would be the fifth and sixth officers to enter the house. *Id.* ¶ 156, J.A. 135.

The police officers' testimony was not entirely consistent with respect to what the plan required once the team had breached the door. Ruscoe, one of the planners, stated that none of the team members was to enter the house until after the third stun grenade was deployed**.** Written Stmt. of Officer William Ruscoe, J.A. 198. Officer Michael Sweeney, the first in the entry team, said that the plan required him to enter the room before the third stun grenade detonated. Sweeney Dep. 246–47, J.A. 227. If Sweeney encountered any occupants once inside the house, his orders were to "pin" them with his shield. *Id.* at 316, J.A. 238.

Irrespective of the plan, the parties now agree that Sweeney entered the house before the third stun grenade detonated. *E.g.*, Guizan's Local Rule 56(a)(2) Stmt., Part I, ¶ 162, J.A. 353. Upon entering, Sweeney saw two men in the far right corner of the room,

crouching, extending their arms, and screaming. Sweeney Dep. 271–74, J.A. 233–34. Sweeney testified at his deposition that when the third stun grenade went off, he felt projectiles striking his boot and his shield, and he "thought [he] was taking fire." *Id.* at 249–50, J.A. 228. He further testified that he felt Terebesi push and pull on his shield, and his pistol being pulled downward and away. *Id.* at 322–23, 329–30, J.A. 240–42. Sweeney fired his pistol for the first time as the third stun grenade detonated. Guizan's Local Rule 56(a)(2) Stmt., Part II, ¶ 113, J.A. 402. He then fired repeatedly until he regained control of his weapon. Sweeney Dep. 331, J.A. 242. These shots hit Guizan several times, killing him. Defs.' Local Rule 56(a)(1) Stmt., ¶ 179, J.A. 139. During the commotion, Weir fired one shot into the floor. Guizan's Local Rule 56(a)(2) Stmt., Part II, ¶ 142, J.A. 409.

The plaintiffs disputed Sweeney's testimony, arguing that no struggle took place, that there was no time for any struggle, and that the forensic evidence does not support Sweeney's description of events. The defendants' forensic expert stated that, at the time at least some of the shots were fired, Guizan's left hand was within a distance of Sweeney's weapon that was "greater than actual contact but less than twelve inches." *Id.* ¶ 180, J.A. 139. The plaintiffs did not dispute the distance, but argue that the forensic evidence suggests that at the time of the shooting, Guizan was on the floor, sitting or lying on his back, with his hands turned away from Sweeney. Guizan's Local Rule 56(a)(2) Stmt., Part II, ¶ 131, J.A. 405–06.

After he stopped shooting, Sweeney fell on top of Terebesi, pinning him with his shield. Defs.' Local Rule 56(a)(1) Stmt., ¶ 176, J.A. 139. Terebesi alleges that, while he was pinned to the floor, someone, who he now thinks was Sweeney, struck him with a firearm. Terebesi's Rule 56(a)(2) Stmt., ¶ 204, J.A. 276. Terebesi

14

claims that the entire incident exacerbated his pre-existing post-traumatic stress disorder and caused injuries to his head, neck, and extremities.  *Id.* ¶ 205, J.A. 278–79.   The detonation of the stun grenades also started a fire in Terebesi's home, although the resulting damage was apparently not extensive.   *See id.*

After the raid, the police searched the residence, recovering some drug paraphernalia with powder residue and "pieces of brown rock[-]like substance" totaling 0.020 ounces.[6]   Search and Seizure Warrant, J.A. 417-423.   No firearms were found.

**Procedural History**

In 2009, Terebesi and Guizan's estate filed separate complaints in the District of Connecticut against the police officers involved in the raid and in obtaining the search warrant, against the police chiefs of the departments participating in SWERT, and against the municipalities in which the departments were located.   The two cases eventually were consolidated. The complaints included: (i) section 1983 claims for

---

[6] To provide context, we note that although doses—"rocks"—of crack cocaine are sold by size, rather than by weight, *see United States v. Wright*, 131 F.3d 1111, 1113 (4th Cir. 1997), the weight of a typical dose appears to vary from 0.1 to 0.25 grams (0.0035–0.0088 ounces), *see, e.g., United States v. Ramirez-Negron*, 751 F.3d 42, 46 (1st Cir. 2014); *United States v. Barrow*, 287 F.3d 733, 737 (8th Cir. 2002); *United States v. Steward*, 252 F.3d 908, 909 (7th Cir. 2001); Caleb Mason, *Jay Z's 99 Problems, Verse 2: A Close Reading with Fourth Amendment Guidance for Cops and Perps*, 56 St. Louis U. L.J. 567, 570 n.14 (2012) (noting that "rocks" vary "somewhat in weight, but a tenth of a gram is a good rule of thumb"). Assuming that the substance recovered was crack cocaine, the reported amount recovered was therefore roughly equivalent to two to six doses.

violations of the plaintiffs' rights under the Fourth and Fourteenth Amendments based on the defendants obtaining the search warrant and their planning and execution of the raid; (ii) section 1983 claims against the towns and police chiefs for failure to train and for unconstitutional policies and procedures; and (iii) state law claims for negligence.   The plaintiffs sought compensatory and punitive damages, costs, and attorney's fees.

In December 2011, the defendants moved for summary judgment, alleging, among other things, that the claims were barred by federal and state doctrines of qualified immunity.   On August 29, 2012, the district court partly granted and partly denied these motions. *Guizan v. Town of Easton*, No. 3:09-cv-1436(JBA), 2012 WL 3775876, 2012 U.S. Dist. LEXIS 123727 (D. Conn. Aug. 29, 2012).   The court concluded that the department lawfully procured the search warrant and granted summary judgment to the defendants on that claim. But it denied summary judgment with respect to the plaintiffs' other section 1983 and state tort claims against the raid participants and planners.   The district court also granted summary judgment in favor of the police chiefs on the failure-to-train claims, but allowed the municipal liability claims to proceed.

The individual officers then filed this interlocutory appeal challenging the district court's denial of summary judgment concerning their assertions of qualified immunity.[7]   On April 11, 2013, the estate of Gonzalo Guizan notified this Court of an impending settlement with all appealing defendants.   In July, we ordered that the appeal be withdrawn as to the estate,

---

[7] The Town of Darien initially joined this appeal, but withdrew on March 21, 2013.

and that the appeal proceed only with respect to Terebesi.   We heard argument on October 10, 2013.

## DISCUSSION

On appeal, the defendants make three arguments: first, that Terebesi's claims for excessive force arising out of the activation of SWERT, the raid plan, the so-called "dynamic entry," the use of stun grenades, and Terebesi's encounter with Officer Michael Sweeney are all barred by the doctrine of qualified immunity, and that their actions were objectively reasonable; second, that they complied with any requirements of the Fourth Amendment "knock-and-announce" rule, and that they were in any case entitled to qualified immunity on this claim; and, third, that they were entitled to governmental immunity under Connecticut law for Terebesi's negligence claims.[8]

### I.      Appellate Jurisdiction[9] and Standard of Review

This appeal comes to us from the denial of a motion for summary judgment, which ordinarily is not an appealable final order.   *See* 28 U.S.C. § 1291 (limiting jurisdiction to "appeals from . . . final decisions" of a district court); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978) (same).   We may nevertheless entertain appeals from interlocutory orders in the narrow class of

---

[8] Defendant Solomon also argued in his brief that the plaintiffs failed to establish the necessary elements for intentional infliction of emotional distress.   At oral argument, Solomon's counsel indicated that the defendant was no longer pursuing this argument on appeal.

[9] We have the "independent obligation to consider the presence or absence" of appellate jurisdiction, even if the appellee has not raised the issue.   *Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir. 2006), *cert. denied*, 549 U.S. 1282 (2007).

cases in which rights "will be irretrievably lost in the absence of an immediate appeal." *Wabtec Corp. v. Faiveley Transport Malmo AB*, 525 F.3d 135, 138 (2d Cir. 2008) (internal quotation marks omitted). Because federal qualified immunity supplies not only a bar to liability but also an "entitlement not to stand trial or face the other burdens of litigation," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court and the federal courts of appeals allow some interlocutory appeals from district court decisions rejecting defenses of qualified immunity as a "limited exception" to the final judgment rule, *Grune v. Rodriguez*, 176 F.3d 27, 32 (2d Cir. 1999) (internal quotation marks omitted).

A district court's denial of qualified immunity on a summary judgment motion is an appealable final decision only "to the extent the denial turns on an issue of law." *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 277 (2d Cir. 1999); *accord Mitchell*, 472 U.S. at 530. Appealable matters involve "disputes about the substance and clarity of pre-existing law," not about "what occurred, or why an action was taken or omitted." *Ortiz v. Jordan*, 131 S. Ct. 884, 892 (2011) (citing *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996), and *Johnson v. Jones*, 515 U.S. 304, 317 (1995)).

Where factual disputes persist, we may exercise appellate jurisdiction only for the limited purpose of deciding whether, on the basis of "stipulated facts, or on the facts that the plaintiff alleges are true, or on the facts favorable to the plaintiff that the trial judge concluded the jury might find, the immunity defense is established as a matter of law." *Salim v. Proulx*, 93 F.3d 86, 90 (2d Cir. 1996). Our review is thus limited to the defendant's arguments that these "facts show either that he 'didn't do it' or that it was objectively reasonable for him to believe that his action did not violate clearly established law." *Id*. at 90–91. In considering these

18

questions, "we will disregard any disputed facts or facts that contradict [the plaintiff's] version of events." *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 761 (2d Cir. 2003). And while "we have jurisdiction to determine whether the issue is *material*" to the legal issues properly before us, we may not review "whether it is *genuine*." *Bolmer v. Oliveira*, 594 F.3d 134, 140-41 (2d Cir. 2010) (emphasis in original); *see also Droz v. McCadden*, 580 F.3d 106, 108 (2d Cir. 2009) (*per curiam*) ("'[W]e may not review whether a dispute of fact identified by the district court is truly genuine.'" (quoting *Escalera*, 361 F.3d at 743)), *cert. denied*, 559 U.S. 1031 (2010). Within these constraints, "our review is *de novo*." *Bolmer*, 594 F.3d at 141.

The defendants here allege at least some qualified immunity defenses over which we may properly exercise appellate jurisdiction: *inter alia*, that the relevant law was not clearly established, that the application of the Fourth Amendment to certain conduct has not been established, and that the facts as alleged by the plaintiff demonstrate the objective reasonableness of the defendants' actions. Some of the defendants' arguments depend, however, on their versions of contested facts, or on the district court's determinations of evidentiary sufficiency—questions over which we have no jurisdiction. We will therefore continue our jurisdictional inquiry in the course of reviewing the merits of the defendants' appeals.

## II.    Principles of Qualified Immunity

Federal law provides a private right of action for money damages against state officials, acting "under color" of law, who violate a constitutional or statutory right. 42 U.S.C. § 1983; *see also Camereta v. Greene*, 131 S. Ct. 2020, 2030 (2011). But the doctrine of qualified immunity shields both state and federal officials from

19

suit "unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct."[10] *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (setting out the standards for qualified immunity); *Matusick v. Erie Cnty. Water Auth.*, __ F.3d __, 2014 WL 700718, at *18 & n.15, 2014 U.S. App. LEXIS 3683, at *59 & n.15 (2d Cir. Jan. 3, 2014) (discussing the scope of the two-prong inquiry). This doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Official conduct violates clearly established law "when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (brackets omitted)). The purpose of the doctrine is to ensure that the official being sued had "fair warning" that his or her actions were unlawful. *Hope v. Pelzer*, 536 U.S. 730, 739–40 & n.10 (2002). To this end, a plaintiff need not show a case "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."[11] *al-Kidd*, 131 S.

---

[10] We may exercise our "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (modifying *Saucier v. Katz*, 533 U.S. 194 (2001)).

[11] The precedent establishing a constitutional right must be more precise than, for example, the "broad history and purposes of the Fourth Amendment." *al-Kidd*, 131 S. Ct. at

Ct. at 2083; *accord Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (*per curiam*); *Fabrikant v. French*, 691 F.3d 193, 213 (2d Cir. 2012).

To determine whether the relevant law was clearly established, we consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law. *See Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). Even if this Court has not explicitly held a course of conduct to be unconstitutional, we may nonetheless treat the law as clearly established if decisions from this or other circuits "'clearly foreshadow a particular ruling on the issue.'"[12] *Id.* (quoting *Varrone*

_____

2084 (warning courts "not to define clearly established law at a high level of generality") (internal quotation marks omitted). But, in some cases, a generally phrased statement of the law may provide sufficient warning that the defendant's conduct is unconstitutional. *See Hope*, 536 U.S. at 741 ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." (quoting *United States v. Lanier*, 520 U.S. 259, 270-71 (1997)) (internal quotation marks and brackets omitted)). The "salient question . . . is whether the state of the law [at the time of the act] gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Id.*

[12] We do not think that, as some decisions in this Circuit have suggested, "[o]nly Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004) (emphasis added) (citing *Townes v. City of New York*, 176 F.3d 138, 144

21

*v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997)); *see also Weber v. Dell*, 804 F.2d 796, 801 n.6, 803-04 (2d Cir. 1986) (looking to decisions of other circuits for clearly established law), *cert. denied*, 483 U.S. 1020 (1987).

### III.   Excessive Force Claims

The Fourth Amendment governs "the reasonableness of the manner in which a search or seizure is conducted."  *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985); *see also* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .").   Determining whether a use of force was "reasonable" under the Fourth Amendment "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted).   We ask "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (internal quotation marks omitted).   In doing

---

(2d Cir. 1999), *cert. denied*, 528 U.S. 964).   (The author of this opinion was a member of the panel in *Moore*.)   *Townes* correctly stated that we consider "whether the Supreme Court or the Second Circuit had affirmed the existence of the right," *Townes*, 176 F.3d at 144, but the opinion also made clear that, "[e]ven in the absence of binding precedent, a right is clearly established if the contours . . . are sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id.* (citing *Anderson*, 483 U.S. at 640) (internal quotation marks and brackets omitted).  Though not directly binding on this Court, the decisions of other circuits may reflect that the contours of the right in question are clearly established.

so, we consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

This appeal concerns the reasonableness of the raid plan, the decision to use SWERT to effect the search, the use of stun grenades in the raid, and the actions of defendants Sweeney and Weir upon entering Terebesi's residence. We reverse the district court on one point: insofar as it denied summary judgment to Chief Solomon on the issue of his decision to activate SWERT in connection with the search, we conclude that the relevant law was not clearly established. But for the reasons stated below and to the extent that the defendants' appeals are properly before this Court, we affirm the district court's denial of summary judgment as to all defendants on all other excessive force claims.

*A.    SWERT Activation*

The plaintiff's theory of excessive force includes two claims relating to decisions that took place prior to the raid. In one claim, the plaintiff argues that the defendants who developed and approved the raid plan are liable for authorizing an excessive use of force in effecting a search and seizure. This claim concerns the details of the raid plan, and we address it below, in part III.B. Separately, the plaintiff argues that Solomon is liable for authorizing a use of excessive force because he decided to serve the search warrant using a SWAT team rather than ordinary uniformed officers. This claim asserts that the decision to deploy a tactical team can, under certain circumstances, constitute an unconstitutional use of force, regardless of the details of the planned operation. We find that Solomon is

23

entitled to qualified immunity with respect to this decision.

At least two circuits and one decision from the District of Connecticut have suggested that the decision to employ a tactical team may violate the Fourth Amendment's prohibition on excessive force.[13]   *See Estate of Smith v. Marsaco*, 430 F.3d 140, 149-50 (3d Cir. 2005); *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1189–90 (10th Cir. 2001), *cert. denied*, 535 U.S. 1056 (2002); *Warren v. Williams*, No. Civ. 03:40CV537 (JCH), 2006 WL 860998, at *27, 2006 U.S. Dist. LEXIS 18900, at *82–*84 (D. Conn. Mar. 31, 2006).   The district court referred to these decisions in denying summary judgment on this issue.   *Guizan*, 2012 WL 3775876, at *11, 2012 U.S. Dist. LEXIS 123727, at *31-*32.

In November 2012—after the district court's decision in this case, but before the appeal was briefed—a panel of this Court determined that "there was no 'clearly established' right in this Circuit to be free from the deployment of a police SWAT team." *Fortunati v. Vermont*, 503 F. App'x 78, 81 (2d Cir. 2012) (non-precedential summary order).   In that case,

---

[13] These decisions do not necessarily distinguish between claims arising out the decision to *deploy* a SWAT team and claims arising out a particular *plan* for executing a search warrant.   *See Holland*, 268 F.3d at 1189 (whether raid planning, which included the use of a SWAT team, violated the Fourth Amendment); *Warren*, 2006 WL 860998, at *27, U.S. Dist. LEXIS 18900, at *82 (assessing "the decision itself by law enforcement to use 'dynamic entry' (i.e., a 'SWAT team')").   Insofar as these decisions are premised on the substance of the planned operation, rather than on the mere decision to use a tactical team, we think that they provide further support for our decision in part III.B. to affirm the denial of qualified immunity for the plaintiff's planning claim.

24

members of a police tactical team fatally shot a man who was known to be "armed and unstable," who was at large in the woods, and who had threatened family members at gunpoint hours before the shooting. *Fortunati v. Campagne*, 681 F. Supp. 2d 528, 532-34, 544 (D. Vt. 2009), *aff'd*, 503 F. App'x 78 (2d Cir. 2012). Unlike in the case at bar, the challenged decision to deploy a tactical team to take the decedent into custody was made in response to an ongoing and evolving situation, not in the context of the planned execution of a search warrant. Although the district court found a triable issue of fact as to whether it was reasonable to deploy the tactical team, *id.* at 544, both the district court and this Court agreed that the law on SWAT team deployment was not clearly established in this Circuit. *Id.*; *Fortunati*, 503 F. App'x at 81.

We agree that there is no clearly established right in this Circuit to be free from the deployment of a tactical team in general.[14] *Fortunati*, 503 F. App'x at 81. We of course recognize that this Circuit's order in *Fortunati* is not binding precedent. *See United States v. Cassesse*, 685 F.3d 186, 191 n.4 (2d Cir. 2012). But in the context of qualified immunity determinations, police officers are not "expected to predict the future course of constitutional law," and "it is unfair to subject police to money damages for picking the losing side of the

---

[14] We would, in any event, be hesitant to craft a rule that would attach to any decision to deploy a tactical team, regardless of the context and substance of the planned operation. A SWAT team might be properly activated for any number of reasons, some of which we could not anticipate in any single case. *E.g.*, *Fortunati*, 681 F. Supp. 2d at 532–34; *Phillips v. James*, 422 F.3d 1075, 1082 (10th Cir. 2005) (concluding that it was not unreasonable for a police officer to activate a SWAT team to secure the perimeter of a possible crime scene in support of other police operations).

controversy." *Wilson v. Layne*, 526 U.S. 603, 617–18 (1999) (internal quotation marks omitted). It is difficult to ask that a police officer identify clearly established law that three judges of this Court could not find. We therefore reverse the decision of the district court insofar as it denied qualified immunity to Chief Solomon for his decision to call out a tactical team in connection with the search of Terebesi's home.

We stress that our reversal relates only to the decision to deploy SWERT to execute the search warrant. Neither Solomon nor any other defendant is qualifiedly immune at the summary judgment stage from any Fourth Amendment liability he may otherwise have in connection with the planning of the raid, including any liability for authorizing or directing the team members to carry out the search in an unlawful manner or for failing to intervene in constitutional violations committed by others. *See infra*, Parts III.B., V.

## B.     *Raid Plan*

The defendants[15] argue that, because a seizure has yet to take place at the time a raid plan is formulated, planning activity is governed solely by the Fourteenth Amendment's Due Process Clause, which is "violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998). This argument relies on a selective—and incorrect—reading of the case law. We

---

[15] The plaintiff's claims relating to the raid plan apply to Cirillo, Jones, and Ruscoe, who formulated the plan; to Kirby, who reviewed and approved the plan; and to Solomon, who exercised the ultimate authority to approve and direct the plan. The plaintiff also claims that all defendants are liable for failing to intervene with respect to the raid plan; this aspect of the claim is addressed below.

agree instead with the district court that officers who authorize or direct the use of force in effecting a search or seizure must comply with the Fourth Amendment in doing so. And, viewing the facts in the light most favorable to Terebesi, we conclude that his claims in this respect were sufficient to withstand the defendants' claims of qualified immunity at the summary judgment stage.

A plaintiff is permitted to bring suit under section 1983 against "[e]very person who . . . causes [him] to be subjected" to a deprivation of constitutional rights. 42 U.S.C. § 1983; *Rizzo v. Goode*, 423 U.S. 362, 370 (1976). Section 1983 does not give rise to *respondeat superior* liability against the employer of a person who infringes upon another's constitutional rights. *Iqbal*, 556 U.S. at 676. But a supervisor may be held liable if he or she was personally a "direct participant" in the constitutional violation. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (*per curiam*). In this Circuit, a "direct participant" includes a person who authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally. *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001); *see also Gronowski v. Spencer*, 424 F.3d 285, 293–94 (2d Cir. 2005) (addressing a city mayor's role in allegedly unconstitutional retaliation against the plaintiff, a former city employee).

This principle is often reflected in our cases concluding that a defendant in a section 1983 suit "did not engage in *or authorize* any of the brutalities alleged." *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065–66 (2d Cir. 1989) (emphasis added) (concerning a plan to retake the Attica prison from rioting inmates); *see also Rizzo*, 423 U.S. at 371 (stressing that there was no evidence showing the defendants' "authorization or approval" of misconduct); *Williams v. Vincent*, 508 F.2d 541, 546 (2d

27

Cir. 1974) (rejecting claim because it did not allege authorization of specific conduct). Other circuits that have addressed excessive force claims like Terebesi's have reached similar conclusions. *See, e.g.*, *Backes v. Village of Peoria Heights*, 662 F.3d 866, 869–71 (7th Cir. 2011) (concluding that, while police chief might have been liable if he had approved a raid plan that involved excessive force, he had instead deferred to an outside tactical team over which he had no authority); *Santiago v. Warminster Township*, 629 F.3d 121, 129 (3d Cir. 2010) (claim that defendants "creat[ed] and authorize[ed]" a raid plan that directed other officers to use excessive force was distinct from a theory of *respondeat superior* and was permissible under § 1983); *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998) (stating that, supervisor's liability for an officer's use of excessive force "hinges on whether he set in motion a series of acts by others . . . which he knew or reasonably should have known[ ] would cause others to inflict the constitutional injury" (internal quotation marks omitted)).

Our case law thus clearly establishes that planners may be liable under section 1983 to the extent that a plan for a search or seizure, as formulated and approved by those defendants, provides for and results in an unconstitutionally excessive use of force. *See, e.g.*, *Provost*, 262 F.3d at 155. We therefore reject the defendants' assertions that the law in this respect is not clearly established.[16] A defendant who plans or directs

[16] The defendants' reliance on this Court's opinion in *Salim*, 93 F.3d 86, is misplaced. That case arose from an officer's pursuit and eventual fatal shooting of a 14-year-old boy who had recently escaped from juvenile detention. *Id.* at 88. The plaintiff (the boy's mother) alleged that the officer had himself "created the situation in which the use of deadly force became necessary" by violating police procedure in several respects in advance of the shooting. *Id.* at 92. We

an unreasonable use of force is liable for the resulting constitutional violation as a "direct participa[nt]." *Id*.

---

determined that these alleged failings were irrelevant because the Fourth Amendment reasonableness inquiry "depends only on the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." *Id.*

*Salim* is consistent with a group of "pre-seizure conduct" cases from other circuits. *See generally* Aaron Kimber, Note, *Righteous Shooting, Unreasonable Seizure? The Relevance of an Officer's Pre-Seizure Conduct in an Excessive Force Claim*, 13 Wm. & Mary Bill Rts. J. 651 (2004) (collecting cases). The common thread in these cases is the plaintiffs' attempt to argue that a use of force that might appear reasonable if considered in isolation was in fact unreasonable because the officers' prior conduct created the danger of escalation. *See Schulz v. Long*, 44 F.3d 643, 647 (8th Cir. 1995) (officers' interactions with mentally ill suspect allegedly "set in motion a chain of events which culminated in [plaintiff] being shot"); *Carter v. Buscher*, 973 F.2d 1328 (7th Cir. 1992) (ill-conceived ruse, which did not contemplate excessive force, provoked deadly confrontation); *Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir.) (failure to follow police procedure in pursuit of suspect not relevant to deadly force claim), *cert. denied*, 506 U.S. 973 (1992); *Greenidge v. Ruffin*, 927 F.2d 789 (4th Cir. 1991) (violations of procedure for nighttime prostitution arrests created more dangerous situation). In cases like these, courts in this Circuit and others have discarded evidence of prior negligence or procedural violations, focusing instead on "the split-second decision to employ deadly force." *Salim*, 93 F.3d at 92.

This is not such a case. The plaintiff does not allege that the defendants improperly contributed to the likelihood of a deadly confrontation between the officers and the occupants of the Terebesi home. Rather, he alleges that the raid *as planned*, even if it had gone perfectly and not ended in Guizan's death, constituted an unreasonable use of force against his person and his home.

Terebesi alleges that the raid plan here contemplated a seizure of his person,[17] and that, as formulated (and ultimately executed), the planned use of force was excessive. By formulating and approving the plan, Terebesi contends, defendants Cirillo, Jones, Kirby, Ruscoe, and Solomon authorized or assisted in effecting a seizure involving excessive force.

Even if the plan expressly contemplated only a search, the same Fourth Amendment protections would apply. *See United States v. Ramirez*, 523 U.S. 65, 71 (1998) ("The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of [a search] warrant." (citation omitted)). As with a seizure, the use of excessive force in the conduct of the search may render the police's actions unreasonable. *See, e.g., Los Angeles Cnty. v. Rettele*, 550 U.S. 609, 614 (2007) (*per curiam*) (applying Fourth Amendment test of reasonableness to police conduct in executing a search warrant); *Boyd v. Benton Cnty.*, 374 F.3d 773, 779-80 (9th Cir. 2004) (same); *cf. Winston v. Lee*, 470 U.S. 753, 760 (1985) ("[T]he [Fourth] Amendment's 'proper function is to constrain . . . against

---

[17] The plan expressly provided that the officers would seize occupants of the Terebesi home, and it largely "determine[d] the degree of force initially to be applied in effecting the seizure itself," *Holland*, 268 F.3d at 1190. It called for six officers to charge into Terebesi's home, amid or just after a series of stun grenade detonations, with weapons drawn, and for one officer to "pin" any occupants encountered to the ground with his ballistic shield. J.A. at 353. When the raid was executed, Terebesi was pinned just as the plan described. In other words, the plaintiff alleges that by devising an unreasonable operation, the planners ordered, authorized, or assisted others in subjecting him to excessive force— allegations that fall squarely within clearly established Fourth Amendment prohibitions.

intrusions which are not justified in the circumstances, or which are made in an improper manner.'" (quoting *Schmerber v. California*, 384 U.S. 757, 768 (1966)). Because the raid plan concerned the method used to execute a search warrant, it was, as a matter of clearly established constitutional law, subject to Fourth Amendment protections, irrespective of whether a seizure was contemplated.[18]

The foregoing analysis provides a sufficient basis on which to affirm the district court's denial of qualified immunity at the summary judgment stage. But we cannot determine as a matter of law at this stage whether the plan was reasonable or whether, in light of all the facts, the constitutional principles just elaborated apply with obvious clarity to the planners' actions. The answers to these questions depend on the resolution of several questions of material fact, including whether the plan provided an appropriate period of time for one of the occupants to answer the door before the forced entry, whether the defendants who decided to employ these tactics understood that only a small quantity of drugs was sought, and what the defendants understood or should have understood to be the risks posed in the service of this warrant. The district court determined that genuine disputes exist on these points. At this stage of this litigation, we are bound by the court's conclusions. *Bolmer*, 594 F.3d at 140–41. The defendants' appeals are therefore dismissed to the extent that they allege that the plan was objectively reasonable

---

[18] Of course, as the district court implicitly recognized, Terebesi's planning claim must be limited to those aspects of the raid actually reflected in the operational plan, such as the "dynamic entry" and the use of the shield to "pin" him. *See Guizan*, 2012 WL 3775876, at *12–*13, 2012 U.S. Dist. LEXIS 123727, at *34–*37. Terebesi does not argue, for example, that the raid plan contemplated fatally shooting Guizan.

in light of the facts and circumstances known to each individual defendant at the time.

C.     *Use of Stun Grenades*

The district court also denied summary judgment on the plaintiffs' claims with respect to the use of stun grenades in the raid.   The defendants argue that the application of the Fourth Amendment to the use of such explosive devices is not clearly established, and that their use in this case was objectively reasonable.   These arguments relate to defendants Brennan, Phillipson, and Torresso,[19] who deployed the devices at the rear of the house, and to defendant Lee, who tossed one through the front doorway.   As explained in the foregoing section, they also relate to the liability of the planning defendants.

Stun grenades "detonate with a blinding flash of light and a deafening explosion.   Their function is to temporarily stun people in a targeted building until police or military personnel can get inside."   Radley Balko, *Flashbangs under Fire*, Reason, Feb. 17, 2010, *available at* http://reason.com/archives/2010/02/17/ flashbangs-under-fire (last visited June 23, 2014); *see also* Steve Ijames, *I Learned About Policing from That: Flash Bang Boom*, LawOfficer, Nov./Dec. 2006, *available at* http://www.lawofficer.com/article/magazine-feature/fla sh-bang-boom (last visited July 1, 2014).   A stun grenade detonation is, indeed its purpose is to be, extremely loud.   The explosion produces high

---

[19] Phillipson did not throw a stun grenade himself, but broke a window at the rear of the house and separated the curtains in order to allow the other officers to toss in their grenades. To the extent that the deployment of the stun grenades could constitute a constitutional violation, Phillipson may be held liable as a direct participant for assisting in an unlawful act. *See Provost*, 262 F.3d at 155.

temperatures and has been known to cause fires, burns, and other injuries. *See United States v. Ankeny*, 502 F.3d 829, 837 (9th Cir. 2007), *cert. denied*, 553 U.S. 1034 (2008); *United States v. Folks*, 236 F.3d 384, 387–88 (7th Cir.), *cert. denied*, 534 U.S. 830 (2001); *see also* Alexis Stevens, *Toddler Critically Injured by 'Flash Bang' During Police Search*, *Atl. J. Const.*, May 30, 2014, http://www.ajc.com/news/news/ breaking-news/toddler-critically-injured-by- flash-bang-during-po/nf9XM/ (last visited June 23, 2014); William K. Rashbaum, *Woman Dies after Police Mistakenly Raid Her Apartment*, *N.Y. Times*, May 17, 2003, at B3 (reporting the death of a woman who suffered a heart attack after police threw a stun grenade into her apartment).

As a threshold matter, we conclude that the Fourth Amendment principles governing police use of force apply with "obvious clarity," *United States v. Lanier*, 520 U.S. 259, 271 (1997), to the unreasonable deployment of an explosive device in the home. *Cf. United States v. Jones*, 214 F.3d 836, 837 (7th Cir. 2000) ("[P]olice cannot automatically throw bombs into drug dealers' houses, even if the bomb goes by the euphemism 'flash-bang device.'").

"An officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury."[20]

---

[20] It has become commonplace for defendants in excessive force cases to support their claims to qualified immunity by pointing to the absence of prior case law concerning the precise weapon, method, or technology employed by the police. *See, e.g.*, *Nelson v. City of Davis*, 685 F.3d 867, 884 (9th Cir. 2012) (considering the use of "pepperball projectiles"). As the Supreme Court has made clear, however, it is not necessary to find a "case directly on point" in order to show that the law governing a plaintiff's claim is clearly established. *al-Kidd*, 131 S. Ct. at 2083. Some measure of

*Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994); *see also Hope*, 536 U.S. at 741 ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). The prohibition on unreasonable force has been applied to, *inter alia*, the use of firearms, tear gas, pepper spray, "hog-tying," tight handcuffs, police dogs, batons, and Tasers. *See generally* 1 Ivan E. Bodensteiner & Rosalie Berger Levinson, *State and Local Government Civil Rights Liability* § 1:11 n.66 (2013) (collecting cases). In light of these varied applications, we conclude that no reasonable officer would think that his or her use of a stun grenade in the course of executing a search warrant was beyond the purview of the Fourth Amendment. *See Rettele*, 550 U.S. at 614 (excessive force may render a search unreasonable). We therefore agree with the District of Connecticut's view that the principles governing police use of force set out in *Graham v. Connor*, 490 U.S. 386, must be applied "to claims challenging the use of the distraction device when executing a search warrant."

---

abstraction and common sense is required with respect to police methods and weapons in light of rapid innovation in hardware and tactics. *See generally* Douglas B. McKechnie, *Don't Daze, Phase, or Lase Me Bro!: Fourth Amendment Excessive Force Claims, Future Nonlethal Weapons, and Why Requiring an Injury Cannot Withstand a Constitutional or Practical Challenge*, 60 Kan. L. Rev. 139, 179–87 (2011) (describing innovations in blinding lasers, "directed energy" weapons, Tasers, and sound guns); James Byrne & Gary Marx, *Technological Innovations in Crime Prevention and Policing*, J. Police Studs., No. 2011–3, at 17, 25 (noting widespread adoption of innovative non-lethal weapons, including "chemical irritants, electric shock immobilizing technology, rubber, plastic, wooden bullet guns, beanbag shotguns, [and] strobe and acoustical weaponry").

*Taylor v. City of Middletown*, 436 F. Supp. 2d 377, 386 (D. Conn. 2006).

The question, then, is whether the use of stun grenades was reasonable under the particular circumstances alleged in this case. *See Estate of Escobedo v. Bender*, 600 F.3d 770, 784–86 (7th Cir.) (finding law on stun grenades clearly established before 2005 incident), *cert. denied*, 131 S. Ct. 463 (2010); *Bing v. City of Whitehall*, 456 F.3d 555, 569–71 (6th Cir. 2006) (analyzing use of stun grenades under *Graham*, but finding that the officers had qualified immunity in light of the unusual circumstances surrounding the incident); *Boyd*, 374 F.3d at 778–84 (applying Fourth Amendment reasonableness test to find use of stun grenades unreasonable, but finding qualified immunity in light of, *inter alia*, the dangerousness of the suspect involved); *United States v. Myers*, 106 F.3d 936, 940 (10th Cir.) (finding that a "military-style assault," involving stun grenades, "c[a]me dangerously close to a Fourth Amendment violation," but was not objectively unreasonable in light of the suspect's sometimes violent criminal history), *cert. denied*, 520 U.S. 1270 (1997).

The factors that other courts have considered in assessing whether a particular use of stun grenades was reasonable are no different from those that apply to other forms of force, lethal or non-lethal. In this case, we think it important to determine whether the officers first confirmed that they were tossing the stun grenade into an empty room or open space. *See United States v. Morris*, 349 F.3d 1009, 1012 (7th Cir. 2003) (warning that the use of stun grenades in "close proximity to persons" may not be reasonable); *Boyd*, 374 F.3d at 779 ("[I]t cannot be a reasonable use of force under the Fourth Amendment to throw [a stun grenade] 'blind' into a room occupied by innocent bystanders absent a strong governmental interest, careful consideration of

alternatives and appropriate measures to reduce the risk of injury."); *Taylor*, 436 F. Supp. at 386–87 ("The court cannot conceive of a set of circumstances that would permit an officer . . . to throw a flash-bang device directly at a person.").

It also is more likely that using a stun grenade will be considered reasonable if the subject of the search or arrest is known to pose a high risk of violent confrontation.[21]   *See, e.g., United States v. Boulanger*, 444 F.3d 76, 85 (1st Cir. 2006), *cert. denied*, 549 U.S. 906 (suspect had a history of violent crimes); *Boyd*, 374 F.3d at 783 (constitutional violation not clearly established where officers had reason to believe suspect was armed and layout of dwelling made entry particularly dangerous); *Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 973 (7th Cir. 2003) (suspect had record of aggravated assault and access to weapons); *cf. Graham*, 490 U.S. at 396 (considering, among other factors, "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight").

By contrast, we do not think a reasonable officer would think that it was constitutional to use these devices in routine searches.   Indeed, to the best of our knowledge, every appellate court to address the issue has found questionable the use of stun grenades in routine searches and seizures that do not pose high levels of risk to the officers or third parties.   *See, e.g.,*

---

[21] This is not to say that using a stun grenade in such circumstances is always a sound strategy; a stun grenade may have little effect on a dangerous subject.   *See* Bob Parker, *The High Cost of a Dynamic Entry*, Police Magazine, Sept. 30, 2011, http://www.policemag.com/blog/swat/story/2011/09/how-a-dynamic-entry-went-sideways.aspx (last visited July 1, 2014).

*Meyers*, 106 F.3d at 940 ("Certainly, we could not countenance the use of [stun grenades] as a routine matter."); *Boyd*, 374 F.3d at 782 (quoting *Meyers*); *Escobedo*, 600 F.3d at 785–86 (stressing that, on the facts presented at summary judgment, the plaintiff "was not considered to be a violent, dangerous individual, he was not the subject of an arrest and he did not pose an immediate threat to the police or others"); *Molina*, 325 F.3d at 973 (observing that the use of stun grenades is not appropriate in "most cases"). These cases, although not binding on us, confirm the obvious: People do not automatically lose their right to be free from explosive devices being thrown into their houses simply because there is a valid and outstanding search warrant with respect to the property. The use of a stun grenade must be justified by the particular risk posed in the execution of the warrant.

The facts alleged by Terebesi plainly differ from the kinds of high-risk scenarios, like those cited above, where courts have found the use of stun grenades to be objectively reasonable or within the zone protected by qualified immunity. *See, e.g.*, *Bing*, 456 F.3d at 559 (suspect was reportedly intoxicated and had fired shots at neighborhood youths); *United States v. Baker*, 16 F.3d 854, 855–56 (8th Cir. 1994) (suspected drug dealer was engaged in gang activity, owned two Doberman Pinschers, and had recently barricaded his door in a manner that made entry difficult).

On the facts presented at the summary judgment stage of this case, construed in the light most favorable to Terebesi, all of the stun grenade defendants knew or should have understood that the search warrant was for a personal-use quantity of drugs and that there was no reason to believe that Terebesi posed a risk of violence or resistance. It is true that, at the SWERT briefing, all of the officers were told that Terebesi habitually used

crack cocaine, that he had recently been the victim of a shotgun attack, that he owned a handgun that was "unaccounted for," and that he held what might have been an unusually strong affection for his pet bird.  But none of these facts suggested that Terebesi was ready to engage in violence, that he had any record of or propensity towards violence, that he had immediate access to weapons, or indeed that he was likely to offer any resistance at all.  We therefore conclude that the record, as presented at summary judgment, presents material questions as to whether each defendant's decision to deploy stun grenades was reasonable under clearly established law, in light of his personal knowledge of the facts and circumstances surrounding the search.[22]  We therefore conclude that the district court properly denied the defendants qualified immunity at this stage of the proceedings.

### D.    Actions of Officers Sweeney and Weir

The district court also determined that defendants Sweeney and Weir were not entitled to qualified immunity for their role in executing the raid.[23]

---

[22] Apart from the question of whether it was reasonable for police to deploy stun grenades in executing the warrant to search Terebesi's home at all, there are material disputes with respect to the manner in which the grenades were actually deployed into the residence.  To the extent that the defendants argue that they exercised all appropriate caution in the deployment of the grenades, these assertions are based on disputed facts and must therefore and to that extent be dismissed for lack of appellate jurisdiction.  We note only that, insofar as the use of stun grenades itself was excessive in light of clearly established law, this will be sufficient to establish liability regardless of whether the officers exercised appropriate care in handling their weapons.

[23] The district court based its decision to deny qualified immunity on this issue entirely on the facts surrounding the

Sweeney entered the home first and fired the shots that killed Gonzalo Guizan.   He also pinned Terebesi to the floor with his shield and, according to Terebesi's account, struck him in the head with a pistol.   Weir entered the home immediately after Sweeney and fired one shot into the floor.   Terebesi alleges that he suffered physical injuries from his encounter with Sweeney, and that, by fatally shooting Guizan in Terebesi's presence, Sweeney caused emotional and psychological injury to Terebesi, aggravating a pre-existing condition of post-traumatic stress disorder.   Terebesi also alleges that Weir's actions contributed to these injuries.

As we have explained, the Fourth Amendment protection against unreasonable uses of force extends to the manner in which a search is conducted.   *See Rettele*, 550 U.S. at 614.   Depending on the circumstances, a search may be unreasonable under the Fourth Amendment even if officers do no more than threaten the occupants with firearms.   *See Holland*, 268 F.3d at 1192 ("The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force.   Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time."); 2 Wayne R. LaFave, *Search & Seizure* § 4.8(h) (5th ed. 2013) ("Even a show of force in executing a search warrant, without actual harm to property or person, may be questioned

officers' encounters with Guizan.   As noted above, the estate of Gonzalo Guizan is no longer a party to this litigation. Nevertheless, "we may affirm an appealed decision on any ground which finds support in the record, regardless of the ground upon which the trial court relied."   *Sudler v. City of N.Y.*, 689 F.3d 159, 178 (2d Cir. 2012) (internal quotation marks omitted), *cert. denied*, 133 S. Ct. 2777 (2013).

on Fourth Amendment grounds.").   These principles apply *a fortiori* to the discharge of weapons during a search, such that any reasonable officer must understand that his decision to fire a gun during the execution of a search warrant is subject to Fourth Amendment scrutiny, regardless of whether he hits anyone.

Whether in this case the officers' actions were reasonable in light of clearly established law is not a question we may answer conclusively at this stage of the proceedings.   As the district court recognized, the reasonableness of Sweeney's decision to fire his weapon depends in large part on whether Guizan did in fact attempt to wrest the weapon away from him, whether Sweeney was blinded by debris from the stun grenade explosion, and whether Sweeney reasonably believed he was taking fire once inside the house.   The district court noted, moreover, that the credibility of Sweeney's recollection of these events was subject to genuine dispute.[24]   For the same reasons, we are unable to conclude at this juncture that Sweeney is entitled to qualified immunity for his decision to "pin" Terebesi with his shield.   Because Sweeney's claims to qualified immunity rely on these disputed facts, we have no jurisdiction to entertain them at this time.

Weir, for his part, testified that he fired his weapon because he thought that Guizan was firing at Sweeney.   The credibility of his recollection and the

---

[24] Sweeney has, in turn, raised questions about Terebesi's credibility—a matter that is also for the jury to decide and thus beyond our jurisdiction in this interlocutory appeal. *See, e.g., McClellan v. Smith*, 439 F.3d 137, 148 (2d Cir. 2006); *Cowan*, 352 F.3d at 761 ("[W]e will disregard any disputed facts or facts that contradict [the plaintiff's] version of events.").

sufficiency of the asserted basis for his mistaken impression that Guizan was firing at the officers are—like the factual arguments made by Sweeney—matters to be determined by the factfinder.

We therefore affirm the decision of the district court insofar as it determined that defendants Sweeney and Weir were not entitled to qualified immunity at the summary judgment stage in connection with their roles in the raid of Terebesi's home.

### IV. Knock-and-Announce Violations

It is clearly established that, absent exigent circumstances, the Fourth Amendment requires officers executing a search warrant to knock at the entrance of the premises to be searched and to announce their presence. *Hudson v. Michigan*, 547 U.S. 586, 589 (2006) (noting that the rule has "ancient" roots in the common law, was codified as a federal statute in 1917, and has been treated by the Supreme Court as a "command of the Fourth Amendment" since 1995). Absent exigency, the police must give an occupant a reasonable time to reach the door, "a time that will vary with the size of the establishment, perhaps five seconds to open a motel room door, or several minutes to move through a townhouse." *United States v. Banks*, 540 U.S. 31, 39–40 (2003).

The district court determined that the plaintiffs' knock-and-announce claims could proceed against Brennan, Edwards, Lee, Phillipson, Sweeney, Torresso, and Weir.[25] The defendants argue that exigent

---

[25] Brennan, Phillipson, and Torresso deployed the stun grenades at the rear of the house. Lee was responsible for "knocking and announcing" the police presence, while Edwards breached the door. J.A. 342–43. Sweeney and Weir were the first two officers inside the house; both fired shots.

41

circumstances justified any violation of the knock-and-announce requirement.[26]   Defendants Brennan, Phillipson, and Torresso argue separately that their part in the plan, which was limited to breaking a rear window and throwing two stun grenades into an empty room, was not subject to the knock-and-announce requirement, and that it was objectively reasonable for them to believe that the plaintiff would receive adequate announcement.

*A.    Front-Entry Team*

The ordinary knock-and-announce requirement may not apply where officers reasonably suspect that announcing their presence, "under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).   We consider the following factors as "guideposts for determining the existence of exigent circumstances":

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the

---

[26] The defendants, relying on the testimony of Lee and Edwards, also assert that the officers in the front-entry team complied with the knock-and-announce requirement.   The plaintiffs disputed this testimony, pointing to video and audio evidence suggesting that the officers waited only approximately five seconds after announcing their presence to breach the door.   Because this argument depends on disputed issues of material fact, we lack jurisdiction to assess it.

premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry.

*United States v. Moreno*, 701 F.3d 64, 73 (2d Cir. 2012) (quoting *United States v. MacDonald*, 916 F.2d 766, 769–70 (2d Cir. 1990) (*en banc*) (ellipsis omitted)), *cert. denied*, 133 S. Ct. 2797 (2013). In addition, we take into account whether "quick action is necessary to prevent the destruction of evidence." *United States v. Brown*, 52 F.3d 415, 421 (2d Cir. 1995), *cert. denied*, 516 U.S. 1068 (1996). No one factor is dispositive, and the list here is "merely illustrative, not exhaustive." *Moreno*, 701 F.3d at 73 (quoting *United States v. Gordils*, 982 F.2d 64, 69 (2d Cir. 1992)).

The district court correctly concluded that qualified immunity was not warranted at the summary judgment stage. The plaintiffs presented evidence indicating that all of the defendants understood that the warrant was for a small amount of drugs meant only for personal use. The basis for the officers' entry, in other words, was related to an offense that was neither grave nor violent. *See Moreno*, 701 F.3d at 73. As the Supreme Court stated in a related context, the "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed." *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984) (rejecting exigency as a justification for warrantless nighttime entry into home to arrest drunk-driving suspect).

On the version of the facts most favorable to Terebesi, then, there was not enough evidence for a reasonable officer to conclude that the occupants of the house were so dangerous as to create exigent

circumstances despite the nature of the offense at issue. Apart from Terebesi's perhaps unusually intense ardor for his pet bird, the defendants point to no evidence in the record suggesting that Terebesi would actually use force against the police.[27]   Maybe most tellingly, the officers did not seek or even discuss acquiring a warrant that would expressly have permitted a "no-knock" entry, while several officers testified to understanding that the knock-and-announce rule applied to this operation. And there is no allegation that any exigency arose after the operation began.   *See, e.g.*, *Banks*, 540 U.S. at 37–38 (exigency may arise after the officers knock the first time).   Taken together, these facts suggest that the officers, under the circumstances prevailing at the time of entry, understood there to be no exigent circumstances that would permit dispensing with the knock-and-announce requirement.

For the foregoing reasons, we cannot decide at this stage of the proceedings whether some or all of the front-entry defendants will ultimately be entitled to immunity for the alleged knock-and-announce violations.   The reasonableness of their belief that Terebesi was dangerous turns on precisely what Barton said at the SWERT briefing about Terebesi's gun ownership and his propensity for violence, what reasonable conclusions could be drawn from this information, and whether any of the officers were told that Terebesi would likely shoot at intruders.   We therefore agree with the district court that the issue of exigency is not appropriately decided on summary judgment.

---

[27] Although some officers testified to being told that Terebesi would shoot at them, Terebesi disputes their credibility.

*B.    The "Rake and Break" Team*

The defendants comprising the team at the rear of the house—Brennan, Phillipson, and Torresso—argue that the knock-and-announce rule did not clearly apply to their conduct, which was limited to breaking a window and deploying two stun grenades.   Although Supreme Court case law supports the proposition that breaking a window for the purposes of deploying a weapon triggers the knock-and-announce rule,[28] we need not address that issue here.   On what is contained in the record on summary judgment, we agree with the district court that the actions of Brennan, Phillipson, and Torresso may have frustrated any attempt by the entering officers to comply with the knock-and-announce rule at the front door.

"The knock-and-announce rule gives individuals 'the opportunity to comply with the law and to avoid the destruction of property occasioned by a forcible entry,'" and supplies them with "the 'opportunity to prepare themselves for' the entry of the police."   *Hudson*, 547 U.S. at 594 (quoting *Richards*, 520 U.S. at 393 n.5).   For this reason, the "knock and announcement must be loud enough to be heard, and it must be followed by a pause

---

[28] *United States v. Ramirez*, 523 U.S. 65, 69–71 (1998) (concluding that breaking a garage window for the purposes of pointing a gun inside constitutes an "entry", but finding that exigent circumstances justified dispensing with the knock-and-announce requirement); *see also Rush v. City of Mansfield*, 771 F. Supp. 2d 827, 870 (N.D. Ohio 2011) (stating that the detonation of a stun grenade is itself an "unexpected and threatening intrusion" subject to the "knock-and-announce" requirement); *cf.* 18 U.S.C. § 3109 (setting out circumstances under which a federal officer "may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant").

long enough for someone to answer or come to the door." *United States v. Leichtnam*, 948 F.2d 370, 374 (7th Cir. 1991); *see also Miller v. United States*, 357 U.S. 301, 311 (1958) (suggesting that officers announced their presence too quietly to satisfy the purposes of the rule). As the district court recognized, a series of loud and confusing announcements from all sides of the house may frustrate the dignitary and protective purposes of the rule. *Cf. Hudson*, 547 U.S. at 594 (setting out the purposes for the rule).

The district court correctly found that, on the facts most favorable to the plaintiffs, Brennan, Torresso, and Phillipson might unreasonably have frustrated the purpose of knocking and announcing. After Phillipson broke the window, Brennan and Torresso deployed two stun grenades shortly before the officers at the front door announced their presence. Even after they detonated, the grenades caused glass to continue to fall and break while the officers at the front door were announcing their presence. At the same time, Brennan began shouting, from the rear of the house, "Police. Police with a warrant. Hands up." At this stage of the case, the district court properly concluded that the defendants' actions could have disoriented and confused the occupants of the house, depriving them of a meaningful opportunity to answer the door.

## V.    Failure to Intervene

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). An officer who fails to intercede in the use of excessive force or another constitutional violation is liable for the preventable harm caused by the actions of other officers.

*Id.* Whether the officer had a "realistic opportunity" to intervene is normally a question for the jury, unless, "considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.*

We agree with the district court that, insofar as the raid plan included the use of substantial and violent force, the plaintiff alleged facts suggesting that every defendant had the opportunity to intervene. Whether some of the defendants were in fact unable to intercede in particular uses of force, either because they were not involved in the planning process, or because of the manner, place, and timing of their deployment in the raid itself, is properly a question for a jury. *Id.*

## VI. Immunity from State Negligence Claims

Connecticut law entitles municipal officers to a form of "qualified immunity" for the negligent performance of discretionary acts. *Evon v. Andrews*, 211 Conn. 501, 505, 559 A.2d 1131, 1133–34 (1989). The law provides "three exceptions" to this general rule: (i) where it was apparent that the act would subject a person to imminent harm; (ii) where a statute provides a cause of action against a municipal officer; and (iii) where the act involves "malice, wantonness or intent to injure." *Id.* The district court declined to grant summary judgment on the plaintiffs' negligence claims on state-law immunity grounds, finding that there were genuine disputes of material fact as to the first and third prongs of the inquiry. This finding is not subject to interlocutory appeal. *See In re State Police Litig.*, 88 F.3d 111, 127 (2d Cir. 1996).

## CONCLUSION

We have considered the parties' remaining arguments and find them to be without merit. In light of the foregoing, we REVERSE the judgment of the

district court insofar it determined that Chief Solomon was not entitled to qualified immunity from liability for the decision—standing alone—to activate the SWERT tactical team.   We AFFIRM the judgment insofar as it held that Terebesi's claims implicated clearly established constitutional law with respect to the planning and approval of the raid, the use of stun grenades, the actions of Officers Michael Sweeney and Brian Weir, the alleged knock-and-announce violations, and the duty of police to intervene in constitutional violations by fellow officers.   In all other respects, the defendants' arguments on appeal rely on disputed issues of fact and the appeal is therefore DISMISSED for lack of jurisdiction.   The case is REMANDED for further proceedings.