In the

# United States Court of Appeals

for the

# Second Circuit

August Term, 2018

Argued: March 22, 2018
Decided: May 29, 2020

Docket No. 16-3935

KENNETH CHAMBERLAIN, Jr. as the Administrator of the
Estate of Kenneth Chamberlain, Sr.,

*Plaintiff–Appellant*,

*v.*

CITY OF WHITE PLAINS, P.O. ANTHONY CARELLI, P.O.
MAURICE LOVE, P.O. STEVEN DEMCHUK, P.O. MAREK
MARKOWSKI, SGT. STEPHEN FOTTRELL, SGT. KEITH
MARTIN, LT. JAMES SPENCER,

*Defendants–Appellees*,

WHITE PLAINS HOUSING AUTHORITY, P.O. STEVEN HART,

*Defendants*.[*]

Appeal from the United States District Court
for the Southern District of New York
No. 12-cv-5142 – Cathy Seibel, *Judge*.

---

[*] The Clerk of Court is respectfully requested to amend the official caption as set forth above.

Before:     SACK and HALL, *Circuit Judges.*[**]

The Estate of Kenneth Chamberlain, Sr. brought suit against officers of the White Plains Police Department and the City of White Plains pursuant to 42 U.S.C. § 1983 asserting, *inter alia*, claims for unlawful entry and excessive force resulting in the decedent's death. On Fed. R. Civ. P. 12(b)(6) motions to dismiss, the District Court (Seibel, *J.*) dismissed the claims for unlawful entry as failing to state a claim and determined that some of the officer/defendants were protected from suit by qualified immunity. Because we conclude principally that the complaint and related materials properly considered by the court upon the motion to dismiss for failure to state a claim do state a plausible claim for unlawful entry and that it was also error to determine on such a motion to dismiss that officers were entitled to qualified immunity, we vacate that portion of the district court's judgment and remand for further proceedings. We also vacate and remand for further consideration portions of the judgment determining, on summary judgment, that an officer was not liable for use of excessive force and that certain officers did not

---

[**] Judge Christopher F. Droney, who was originally assigned to the panel, retired from the Court, effective January 1, 2020, prior to the resolution of this case. The remaining two members of the panel, who are in agreement, have determined the matter. *See* 28 U.S.C. § 46(d); 2d Cir. IOP E(b); *United States v. Desimone*, 140 F.3d 457, 458–59 (2d Cir. 1998).

have supervisory liability. In all other respects, we affirm the judgment of the district court.

AFFIRMED IN PART AND VACATED AND REMANDED IN PART.

> DEBRA S. COHEN, Newman Ferrara, New York, NY (Randolph M. McLaughlin and Danielle B. Sullivan, *on the brief*), *for Plaintiff-Appellant* Kenneth Chamberlain, Jr. as the Administrator of the Estate of Kenneth Chamberlain, Sr.
>
> LALIT K. LOOMBA, Wilson Elser Moskowitz Edelman & Dicker, White Plains, NY (John M. Flannery and Peter A. Meisels, *on the brief*), *for Defendants-Appellees* City of White Plains, P.O. Maurice Love, P.O. Steven Demchuk, P.O. Marek Markowski, Sgt. Stephen Fottrell, Sgt. Keith Martin, and Lt. James Spencer.
>
> ANDREW QUINN, The Quinn Law Firm, White Plains, NY, (Lisa M. Fantino, *on the brief*), *for Defendant-Appellee* Anthony Carelli.

SACK and HALL, *Circuit Judges*:

This case arises from a deadly incident that occurred in the City of White Plains, New York, in the early morning of November 19, 2011. It began when Kenneth Chamberlain, Sr. ("Chamberlain"), a 68-year old African-American U.S. Marine veteran with mental illness, living alone in a city-owned rental apartment, accidentally activated an emergency medical-alert system to which he subscribed.

It ended over an hour later in Chamberlain's death when he was shot by police as some dozen heavily armed officers with "tactical gear" were forcing their entry into his apartment.

Plaintiff-Appellant Kenneth Chamberlain, Jr. ("Appellant"), the son of Chamberlain and administrator of his estate, appeals from a final judgment of the United States District Court for the Southern District of New York (Seibel, *J.*) in favor of the defendants. The defendants are: Officers Anthony Carelli, Maurice Love, Steven Demchuk, and Marek Markowski, Sergeants Stephen Fottrell and Keith Martin, and Lieutenant James Spencer, all members of the White Plains Police Force, and the City of White Plains (the "City") itself.

On appeal, Appellant challenges two orders of the district court. The first is the opinion and order dated December 10, 2013, in which the court granted the Rule 12(b)(6) motion to dismiss the unlawful entry claim against individual defendants and to dismiss the excessive force claim against defendant Martin arising from Martin's use of a bean-bag shotgun. The second is the oral decision of September 12, 2016, in which the district court granted summary judgment in favor of the defendants on the supervisory liability claims against Officers Martin and Fottrell, the resurrected excessive force claim against Officer Martin, and the

*Monell* claim against the City. Before trial, the district court granted Officer Carelli's and the City's motions *in limine* to prevent Appellant from introducing evidence supporting a claim of assault based on the actions of the officers before they opened Chamberlain's door and from introducing any medical records addressing Chamberlain's medical conditions. At the conclusion of the jury trial on the excessive force claim against Officer Carelli and on the assault and battery claims under New York state law against Officer Carelli and the City, the jury found in favor of those defendants.

## BACKGROUND

The following statement of facts is drawn from the allegations of the Amended Complaint, as supplemented by the audio and video recordings (and written transcripts thereof)[1] integral thereto.[2] Because we first review the grant of a defendant's 12(b)(6) motion to dismiss, this recitation is based on well-pleaded

---

[1]   The availability in the record of both the district court and this Court of contemporaneous audio and video recordings of the violent events in issue and the circumstances leading up to them, which that court considered on the motions and we consider on this appeal, are unusual, dramatic, and add a dimension to these proceedings that we doubt even a verbatim transcript alone would provide.

[2]  There were also four documents relating to the White Plains and New York City police departments that were submitted as exhibits to the Amended Complaint, *see Chamberlain*, 986 F. Supp. 2d at 379, but they are not relevant to this discussion.

*allegations*, not proven facts. We accept the "well-pleaded factual allegations [augmented on this appeal by the audio and video recordings] as true and draw all reasonable inferences in [Appellant's] favor." *Hart v. FCI Lender Servs., Inc.*, 797 F.3d 219, 221 (2d Cir. 2015).

At around 5:00 a.m. on November 19, 2011, Chamberlain accidentally activated his Life Aid medical button.[3] The Life Aid operator who responded to the alert immediately sought to contact Chamberlain "via a two-way communication device" located in his home, Amended Complaint ¶ 12, but was unsuccessful. The device began recording attempts by the operator to reach Chamberlain.

Unable to communicate directly with Chamberlain, the Life Aid operator reported the medical alert to the White Plains Department of Public Safety, which directs and controls White Plains' police and emergency services. The operator also contacted Chamberlain's sister, Carol Mathew, at her residence in North Carolina.

---

[3] Chamberlain subscribed to a "Life Aid" medical alert service that provides customers with a help button to alert Life Aid in the event of an emergency so that the service can provide or obtain assistance for the subscriber.

In response to the Life Aid call, the police dispatcher in White Plains sent an ambulance and a police squad car to Chamberlain's apartment. By searching the police database, the dispatcher learned that Chamberlain had been previously classified as an "emotionally disturbed person."[4] The dispatcher advised all responding units of that fact and "downgraded" the call so that no lights or sirens would be used, presumably to avoid agitating Chamberlain unnecessarily.

When the police arrived at Chamberlain's apartment complex, they entered and proceeded to his front door. Despite the dispatcher's warning that Chamberlain was a person with mental illness, the officers began banging loudly on his door and shouting demands that they be allowed to enter. The noise alarmed Chamberlain, who then activated his Life Aid button to report "an emergency" that "the White Plains Police Department [is] banging on my door and I did not call them and I am not sick." J. App'x. 210 (Transcript of Clip 201). The operator attempted to inform the police officers at the apartment that she was "on the line with Mr. Chamberlain[,] he's ok at this time," but it is not clear from the audio recording whether she was successful in doing so. *Id.* at 211 (Transcript

---

[4]   Appellant states that Chamberlain's classification as an "emotionally disturbed person," or "EDP," relates back to an incident when he called the police to report a break in and the officers' subsequent interactions with him at that time.

of Clip 202). Soon thereafter, however, the operator completed a telephone call to the White Plains Police to cancel the police dispatch. In response, the police dispatcher informed her that "they're gonna make entry anyway . . . . They're gonna open it anyway." *Id.* at 213 (Transcript of Clip 203).

Chamberlain also repeatedly told the Life Aid operator and the officers at his door that he had not called the police. *Id.* at 220 (Transcript of Clip 207) ("Life Alert [sic] the police are forcing my door and I did not call for them."); *id*. at 219 (Transcript of Clip 206) ("I didn't call you."); *id*. at 229 (Transcript of Clip 209) ("I never called the police department."). One officer at the scene acknowledged as much: "Mr. Chamberlain, your medical alert went off accidentally." *Id.* at 229 (Transcript of Clip 209) (attributed to Police Officer Hart). Further, from the beginning of his encounter with the police, Chamberlain stated lucidly, repeatedly, and emphatically to the Life Aid operator and the officers at his door that he was not in need of assistance. *See, e.g., id.* at 212 (Transcript of Clip 202) (stating that he was "okay" five times and "fine" twice); *id*. at 214–15 (Transcript of Clip 204) ("okay" twice; "fine" twice); *id*. at 219 (Transcript of Clip 206) ("okay" three times); *id*. at 230–36 (Transcript of Clip 209) ("okay" eight times; "fine" sixteen times).

Despite this insistence by Chamberlain and information from the Life Aid operator that Chamberlain was not in need of medical attention and that the Life Aid device had been triggered accidentally, the officers "continued relentlessly in their attempts to forcibly gain entry to the apartment." Amended Complaint ¶ 34. Because Chamberlain continued to refuse to open his door, the officers radioed for tactical reinforcements. There were approximately twelve officers in the augmented police force when they attempted to gain entry. They were armed with heavy "tactical gear," including handguns, a beanbag shotgun, Taser, riot shield, and pepper spray.[5]

The police initiated their entry into Chamberlain's apartment using a master key that they had received from the White Plains Housing Authority. However, a "slap lock" on Chamberlain's door, acting rather like an engaged door chain,

---

[5]  A case-law search for "tactical gear" indicates that the term is commonly used, but rarely defined. *See, e.g.*, *Cruz v. City of New Rochelle*, No. 13 Civ. 7432 (LMS), 2017 WL 1402122, at *4 (S.D.N.Y. Apr. 3, 2017) ("According to [the police sergeant], he did not have his officers put on their tactical gear because he didn't want to elevate the situation . . . ." (internal quotation marks omitted)). It apparently refers to equipment carried on the person that is designed and used to aid the individual in physical, often military or law enforcement, combat.

prevented the door from being opened more than a few inches.[6] The officers wedged a Halligan tool—a relative of a crowbar—into the door opening to prevent Chamberlain from closing the door. This initial partial opening of the door was sufficient for the police to confirm visually that Chamberlain was not in need of medical attention and that Chamberlain, who had long lived alone, "was not [at the time the forced, armed entry began], a danger to himself or the officers." Amended Complaint ¶ 32.

Once the door was propped open—and Chamberlain could view the heavily armed officers in front of his door—the encounter escalated dramatically. Seeing the officers' weapons, Chamberlain apparently grew fearful for his life and limb. *See* J. App'x 229 (Transcript of Clip 209) ("you gonna shoot me, you got your gun ready"); *id.* at 235 (Transcript of Clip 209) ("They have stunguns and shotguns at the ready. They gonna hit me with the stungun."); *id.* at 236 (Transcript of Clip 209) ("[T]hey are standing here with stunguns and shotguns . . . and a 9mm Glock at the ready."). Chamberlain also shouted repeatedly that he was convinced that the police were there to kill him. *See id.* at 221 (Transcript of Clip 207) (stating

---

[6] The Amended Complaint refers to "a few inches." Amended Complaint ¶ 41. In the district court's estimation, based on its review of the Taser videos, it was "about two inches." *Chamberlain*, 986 F. Supp. 2d at 375 n.3.

"you're gonna kill me" five times); *id.* at 223 (Transcript of Clip 207) ("They are trying to hurt me and murder me."); *id.* at 227 (Transcript of Clip 209) ("They are trying to break in to murder me."); *id.* at 236 (Transcript of Clip 209) ("They're getting ready to kill me or beat me up."). As Chamberlain became more agitated, he began exhibiting delusions, hallucinations, and flashbacks to his time in military service.[7]

In response to the officers' attempts to pry open his door further—wide enough to allow them to enter bodily—Chamberlain began thrusting a knife through the partial opening. *Id.* at 228 (Transcript of Clip 209) ("Every time we come to the door he sticks a knife out."). Chamberlain asserted that he intended only to protect himself. Amended Complaint ¶ 47; J. App'x 230 (Transcript of Clip 209) ("They have their guns out . . . I have a weapon. I am protecting myself."). At no point did Chamberlain threaten to harm the officers or himself if they left his apartment; indeed, he repeatedly asked them to leave. *See id.* at 234 (Transcript of

---

[7] Chamberlain also repeatedly informed the officers that he had a pre-existing heart condition that complained their actions were directly exacerbating it. *See* J. App'x 228 (Transcript of Clip 209) ("I'm a 68 year old man with heart troubles and you're gonna beat me."); *id.* at 248 (Transcript of Clip 212) ("I have a heart condition. I have a breathing condition. Leave."); *id.* at 263 (Taser Video Clip #1) ("They're trying to kill me . . . I have a bad heart.").

Clip 209) ("All you have to do is leave."); *id.* at 230 ("Go home . . . . I'm ok, I'm fine.").

While attempting to enter the apartment, the police officers mocked and insulted Chamberlain. *Id.* at 234 (Transcript of Clip 209) ("You ain't no young kid"; "You a grown-ass man."); *id.* at 237 (Transcript of Clip 209) ("I don't give a f***, n*****.") (disputed by defendants); *id.* at 223 (Transcript of Clip 207) ("mother f***er.") (disputed).[8]

The police would not permit Chamberlain to speak to his family members. Chamberlain's sister Carol Mathew was on the telephone from her North Carolina home with the Life Aid operator throughout much of the confrontation. Chamberlain asked to speak with her. *Id.* at 254 (Transcript of Clip 216) ("[A]t this point [Chamberlain] is actually asking for you.") (Life Aid operator to Carol). The officers did not facilitate that contact. Carol's daughter—Chamberlain's niece, Tonyia—lived in the same building as Chamberlain. She was standing inside the building, outside his apartment, during the impasse, offering to help. She

---

[8] The parties dispute some of the content of the recordings. The plaintiff asserts that these statements were made, which the defendants deny. Although disputed, for purposes of reviewing this motion to dismiss we accept as true, as we must, all well-pleaded factual allegations in the complaint, including the plaintiff's version of the verbal confrontation. *Chase Grp. All. v. City of New York Dep't of Fin.*, 620 F.3d 146, 150 (2010).

"pleaded with the officers to allow her to speak with her frightened uncle." Amended Complaint ¶ 36. The officers refused her request. J. App'x 243 (Transcript of Clip 210) ("My daughter just went down and they told her to move back . . . because . . . they had dr[awn] their guns . . . .") (Carol to Life Aid operator). Carol also advised the police that Chamberlain had a son—now Appellant in this action—whom he might wish to contact. The police made no effort to put them in contact with one another.

After the hour-long standoff, despite Chamberlain's repeated pleas that the officers leave and the availability of a relative on-site to attempt to defuse the situation, the officers forcibly removed Chamberlain's door from its hinges, leaving the doorway open. When the door fell, Chamberlain was standing some six to eight feet behind the doorway wearing only a pair of boxer shorts. Before they deployed their weapons, one of the officers said: "[g]onna get this f***** he [sic] comes flying out." *Id.* at 269 (Taser Video Clip 3) (disputed).

When the door was fully open, from the hallway, the officers, in swift succession, tased Chamberlain (unsuccessfully), fired several beanbag shots at him (largely ineffectively), and fired two shots at him with a handgun. One of those bullets passed through Chamberlain's lungs and ribs and severed his spine, killing

him. After the shots were fired, the officers entered, grabbed Chamberlain's feet, and dragged him out of the apartment.

## DISCUSSION

On appeal, Appellant brings a variety of challenges to the final judgment and to orders of the district court entered during the course of the litigation. We first address Appellant's argument that the district court erred in dismissing his unlawful entry claim on a Rule 12(b)(6) motion. Next, we consider his challenges to the district court's grant of summary judgment in favor of the defendants on the excessive force, supervisory liability, and *Monell* liability claims. The district court granted Officer Martin's Rule 12(b)(6) motion to dismiss the excessive force claim against him, but the court then permitted Appellant to reassert that claim at the summary judgment stage. We will, therefore, address that claim when we address the other challenges to entry of summary judgment. Finally, we review Appellant's challenges to the court's evidentiary rulings made in connection with the trial.

## I.

## Unlawful Entry Claim

### A. Standard of Review

Appellant asserts that the amended complaint alleges facts sufficient to state

14

a claim for unlawful entry. We review *de novo* the district court's decision granting the defendants' motion to dismiss on that ground. *See Dolan v. Connolly*, 794 F.3d 290, 293 (2d Cir. 2015). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[D]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered" when ruling on a motion to dismiss. *Beauvoir v. Israel*, 794 F.3d 244, 248 n.4 (2d Cir. 2015). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted).

## B. Warrantless Entry

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend IV. "The home has properly been regarded as among

15

the most highly protected zones of privacy, and the sanctity of private dwellings is ordinarily afforded the most stringent Fourth Amendment protection." *Ayeni v. Mottola*, 35 F.3d 680, 685 (2d Cir. 1994) (footnotes, brackets, and internal quotation marks omitted), *abrogated on other grounds*, *Wilson v. Layne*, 526 U.S. 603, 618 (1999). Indeed, "[i]t is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (internal quotation marks omitted). It is thus a "basic principle of Fourth Amendment law[] that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 749 (internal quotation marks omitted). "This protection adheres whether the seizure is for purposes of law enforcement or due to an individual's mental illness." *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016).

For the warrantless entry of a home to be rendered reasonable despite the presumption to the contrary, it must "meet an exception to the warrant requirement." *Anthony v. City of New York*, 339 F.3d 129, 135 (2d Cir. 2003). Here, the defendants rely on the "exigent circumstances" exception, and more specifically, the "emergency aid doctrine," to justify their warrantless entry. Under the emergency aid doctrine, exigent circumstances exist permitting entry if law

16

enforcement has probable cause to believe that a person is "seriously injured or threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *see also Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (warrantless entry may be "justified by any emergency threatening life or limb"); *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (officers may enter private home without a warrant "to render emergency aid"). To conclude there is probable cause for a forced entry under the emergency aid exception "requires finding a probability that a person is in danger." *Kerman v. City of New York*, 261 F.3d 229, 236 (2d Cir. 2001) (internal quotation marks omitted). The mere "possibility of danger" is insufficient. *See Hurlman v. Rice*, 927 F.2d 74, 81 (2d Cir. 1991) (internal quotation marks omitted). When probable cause exists to believe there is a medical emergency, "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Mincey*, 437 U.S. at 392 (internal quotation marks omitted).

In order to justify a warrantless entry on the basis of exigent circumstances, though, "the police bear a heavy burden." *Welsh*, 446 U.S. at 749–50. The "core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to

17

render aid or take action." *United States v. Klump*, 536 F.3d 113, 117–18 (2d Cir. 2008) (internal quotation marks omitted) (affirming conviction based in part on such evidence). In that regard, "a warrantless search must be strictly circumscribed by the exigencies which justify its initiation," and may not be justified by subsequent rationalizations. *Mincey*, 437 U.S. at 393 (internal quotation marks omitted). This "objective" inquiry requires the district court to consider "the totality of the circumstances confronting law enforcement agents in the particular case." *Klump*, 536 F.3d at 117 (internal quotation marks omitted).[9]

Turning to the facts of this case: As an initial matter, it is unclear when, during the course of the hour-long standoff, as a legal matter, the entry was made.[10] Typically, a "moment of entry" is just that: a moment. Indeed, the word

---

[9] In the context of entry into a home to effect an arrest, we have articulated six "illustrative guides" to determine whether an officer needed to act urgently: (1) the "gravity or violent nature of the [suspect's] offense"; (2) "whether the suspect is reasonably believed to be armed"; (3) "probable cause . . . to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises"; (5) "likelihood that the suspect will escape if not swiftly apprehended"; and (6) "peaceful circumstances of the entry." *United States v. Fields*, 113 F.3d 313, 323 (2d Cir. 1997) (quoting *United States v. MacDonald*, 916 F.2d 766, 769–70 (2d Cir. 1990)). These factors, while applicable to exigent circumstances for a fleeing felon, are inapplicable where, as here, the plaintiff committed no offense and is in the presumptive safety of his own home.

[10] In his opening brief, Appellant assumes that the unlawful entry claim accrued (and that the officers therefore needed to establish exigent circumstances) when the officers initiated entry by using the master key and inserting the Halligan tool. *See* Appellant's

"entry" ordinarily connotes a single act. When one crosses the threshold into his or her home by means of a door, he or she can be expected to unlock it if necessary, turn the doorknob if there is one, and then push or pull the door open: Entry. We would expect the same ordinarily to be true of a police entry onto private property: a single, brief, and decisive action to enter. A police officer, for reasons of safety at least, seems unlikely to want to prolong the process. And that is the sort of entry upon which much of the case law governing police entry is built.

Here, however, the facts are not "ordinary." The process of gaining physical entry into Chamberlain's apartment took more than an hour from the moment the officers arrived at the apartment until the moment they tore off Chamberlain's door, ready to cross the threshold into the apartment, and then, when lesser measures apparently failed to subdue Chamberlain, fatally shot him.[11] Only then

_____

Br. 32 ("[T]he Amended Complaint and the Life Aid recordings do not provide the factual predicates necessary for the emergency aid doctrine to apply prior to the initiation of the entry with the master key and insertion of the hooligan tool."); *id.* at 34 (noting that the Taser video footage was irrelevant to the unlawful entry claim because it "only captured events occurring over one hour *after* the unlawful entry claim was initiated."). The defendants state simply that entry happened "eventually." Neither the Amended Complaint nor the recordings identify a specific time of entry.

[11] As an aside, we note that the initial opening of the apartment door a crack, as alleged, might plausibly, and taken alone, have been an "entry" for Fourth Amendment purposes,

did the officers physically enter the apartment to remove Chamberlain's body. To be deemed reasonable and therefore lawful, the officers' conduct must have been justified by exigent circumstances until they completed their entry. *See Mincey*, 437 U.S. at 392–93; *United States v. O'Neill*, 239 F. Supp. 3d 651, 658 (W.D.N.Y. 2017) ("A warrantless search is no longer permissible once the exigency ends.").

Based on the facts alleged and otherwise before the district court, viewed in the light most favorable to Appellant, we conclude that a reasonable, experienced officer would not have determined there was probable cause to believe that Chamberlain needed urgent medical attention. The officers outside of his

---

even had nothing further taken place. As we made clear in *Loria v. Gorman*, 306 F.3d 1271 (2d Cir. 2002):

> [T]he Fourth Amendment has drawn a firm line at the entrance to the house . . . any physical invasion of the structure of the home, by even a *fraction of an inch*, is too much to be tolerated . . . . No invasion of the sanctity of the home can be dismissed as *de minimis*. A sane, decent, civilized society must provide some oasis, some shelter from public scrutiny, some insulated enclosure, some enclave, some inviolate place which is a man's castle.

*Id*. at 1284 (internal citations and alterations omitted) (first emphasis added). Here, the first entry by master key was only a relatively small part of the officers' entry, which ultimately far exceeded the limited entry found to be unreasonable in *Loria*.

apartment knew that the Life Alert system had been activated accidentally.[12] The Life Aid operator informed the police dispatcher that Chamberlain was not in need of medical assistance. And Chamberlain himself firmly and repeatedly informed the officers that he had not called for help and was not in need of assistance of any kind, let alone urgent medical aid.

Appellant's allegation that the officers knew Chamberlain was not in need of medical attention is supported by allegations and evidence of the officers' behavior on the scene: Despite Chamberlain's rising anxiety about the officers' presence and aggressive actions, the officers escalated the confrontation by making derisive comments and by declining to permit or arrange for Chamberlain to speak with members of his immediate family. *See Bah v. City of New York*, No. 13

---

[12] In light of these facts, the district court erred in ruling that the plaintiff's assertion that "the officers knew that the Life Aid system had been triggered accidentally . . . is conclusory and [] therefore need not [be] accept[ed]." *Chamberlain*, 986 F. Supp. 2d at 382 n.7. Chamberlain alleges that "[a]t all times, [the defendants] knew [] Chamberlain['s] Life Alert system had been activated accidentally." Amended Complaint ¶ 71. The recordings appear to support this allegation. *See* J. App'x 229 (Transcript of Clip 209). The Life Aid operator informed the police dispatcher that Chamberlain was not in need of medical assistance. One of the officers told Chamberlain that his Life Alert had been activated accidentally. *See id*. at 229 (Transcript of Clip 209) ("Mr. Chamberlain, your medical alert went off accidentally . . . .") (ascribed to Police Officer Hart). At the motion to dismiss stage, therefore, we must accept as true that the officers were aware, throughout their hour-long entry into Chamberlain's apartment, that the alert was accidental.

Civ. 6690 (PKC) (KNF), 2014 WL 1760063, at *7 (S.D.N.Y. May 1, 2014) (denying motion to dismiss after finding plausible an allegation of unlawful entry where, in response to a report of a son having a mental health crisis, officers prevented his mother, who was present, from seeing him, since "it [was] plausible that immediate action was not necessary as the [officers], at minimum, may have been able to enlist [her] help").

And when, eventually, the officers entered Chamberlain's apartment, they did so not with a gurney and paramedics, or other equipment or personnel related to a possible health emergency, but with a Taser, a beanbag shotgun, and handguns. Instead of treating Chamberlain as a critically ill patient, the officers acted as though he were a criminal suspect. *See, e.g.*, *Hopkins v. Bonvicino*, 573 F.3d 752, 760, 764–66 (9th Cir. 2009) (denying summary judgment on unlawful entry claim where officers claimed medical emergency but, instead of exhibiting care and concern for the plaintiff upon entry, handcuffed him at gunpoint). These facts as alleged in the complaint and related documents, and viewed in the light most favorable to Appellant, give rise to the plausible inference that the officers knew that Chamberlain was not in need of urgent medical assistance but chose to enter

his home anyway. *Chase Grp. All. LLC*, 620 F.3d at 150; *see also Mincey*, 437 U.S. at 392–93; *Klump*, 536 F.3d at 117.

The fact that Chamberlain was classified as an "emotionally disturbed person" does not alter this analysis. It was alleged, and is undisputed, that the officers were aware from the start of their encounter with Chamberlain that he had a history of mental illness. It is plausibly alleged that rather than serving as justification for forcing entry into his apartment, that knowledge would have led a reasonable, experienced officer to conclude that Chamberlain's conduct—which eventually included incoherent statements and erratic behavior—was not symptomatic of a medical emergency but rather a long-standing psychiatric or emotional condition. *See Klump*, 536 F.3d at 117 (considering "the totality of the circumstances confronting law enforcement agents in the particular case" (internal citation omitted)). It seems to us that a reasonable officer likely would have known—or at least learned quickly during the course of the encounter—that the officer's actions were exacerbating Chamberlain's condition. Thus, on the facts alleged, the officers did not have probable cause to enter Chamberlain's apartment merely based on his pre-existing medical or psychiatric condition of which they were aware. *See Welsh*, 446 U.S. at 749–50 (explaining the "heavy burden" that

23

police bear "when attempting to demonstrate an urgent need that might justify warrantless searches"). Appellant thus plausibly alleged that the officers' warrantless entry was not justified by a threat of immediate danger to Chamberlain.[13]

Neither do the Amended Complaint and supplemental recordings suggest that the officers had a credible concern that Chamberlain posed a risk of harm to a *third party.* During the course of his lengthy standoff with the police, Chamberlain mentioned two women: Lynette and Loretta, but he also mentioned the President,

---

[13] The district court erred in concluding that it would have been "irresponsible" for the police to have accepted Chamberlain's assurances that an emergency call had been accidentally placed because Chamberlain was "clearly unstable." *Chamberlain*, 986 F. Supp. 2d at 382 & n.7. As discussed, both Chamberlain and the Life Aid operator—who presumably had intimate knowledge of Chamberlain's medical history—repeatedly and unequivocally informed both the police dispatcher and the officers at Chamberlain's door that he was not in need of medical assistance. It is not at all clear to us how or why, when deciding this motion to dismiss, the district court found as a matter of fact that Chamberlain was mentally incapable of providing adequate assurances of his own medical needs. And it would nonetheless not have been "irresponsible" for the officers to rely on the assurances from the Life Aid operator, a health care professional.

The district court also erred in concluding that it would have been objectively reasonable for the officers to have concluded that Chamberlain had "impliedly consented to warrantless entry" merely by "owning and using a Life Aid device" and that "a subsequent withdrawal of that consent—by a clearly unstable person . . . should not be honored." *Chamberlain*, 986 F. Supp. 2d at 383 n.8. Even were that the case, which seems unlikely, we fail to understand that logic when, as here, the Life Aid operator directly communicated to the police that the alert had gone off accidentally.

Vice President, and Attorney General of the United States. Neither the Life Aid operator nor the officers on the scene asked Chamberlain whether another person was in his apartment.[14] Under the facts as alleged, a reasonable experienced officer could have seen these one-off references as part of an unbalanced tirade by a highly agitated person with mental illness rather than a conversation with actual but unseen, unheard, and unknown persons in his presence. Thus, based on the allegations before the district court as augmented by the audio and video recordings, the officers' warrantless entry cannot be justified on the ground that Chamberlain posed a risk of harm to a third party in his apartment.[15]

To the extent any non-medical exigency existed during the entry, as noted repeatedly above, it is plausible that the officers themselves created it. "[I]n most

---

[14] Discovery might establish whether or not it was a post-hoc justification for the officers' actions. *See United States v. Simmons*, 661 F.3d 151, 158 (2d Cir. 2011) (rejecting exigent circumstance justification for warrantless entry when a claim that a third party may be at risk was "untethered to any facts in the record").

[15] This case is easily distinguishable from those where a third party is known or believed to be present and appears to be at risk. *See, e.g., City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775 (2015) (police were informed that a person with mental illness threatened to kill a social worker); *Brigham City v. Stuart*, 547 U.S. 398, 406 (2006) (police observed a violent altercation during which an individual was struck in the face and was "spitting blood"); *Anthony v. City of New York*, 339 F.3d 129, 131 (2d Cir. 2003) (police responded to a 911 call from a woman inside an apartment who claimed to be at risk of immediate physical injury); *Tierney*, 133 F.3d at 192 (police called by neighbor reporting a "bad" domestic dispute).

circumstances, the exigent circumstances rule should not apply where the police, without a warrant or any legally sound basis for a warrantless entry, threaten that they will enter without permission unless admitted." *Kentucky v. King*, 563 U.S. 452, 462 n.4 (2011) (deciding on other grounds because no such threat was made). While officers may "knock on a door as any private citizen might" without a warrant, they "may not gain entry by actually violating or threatening to violate the Fourth Amendment." *United States v. Moreno*, 701 F.3d 64, 73 (2d Cir. 2012); *cf. United States v. Lucas*, 462 F. App'x 48, 50 (2d Cir. 2012) (summary order) (noting that an officer did not "create the exigency" relied on to enter an apartment because he "made no threat to enter the apartment"). Here, as alleged and as reflected in the recordings, the police threatened and attempted objectionable conduct by insisting that if Chamberlain did not open his door, they would force entry. *See*, *e.g.*, J. App'x 213 (Transcript of Clip 203) ("[T]hey're gonna make entry anyway."); *id.* at 219 ("You want me to break your door down is that what you want?"). As a result, any non-medical exigent circumstances may well have been of the officers' own making, resulting from their direct threats to enter Chamberlain's apartment forcibly, and not a permissible basis for entry.

26

Again emphasizing that our decision is based only on the facts as we must view them at this stage of the proceedings, we conclude that a reasonable, experienced officer would not be justified in believing that entry into the apartment was necessary. We therefore vacate that portion of the judgment of the district court dismissing the unlawful entry claim. See *Dolan*, 794 F.3d at 293; *Klump*, 536 F.3d at 117–18.

**C. Qualified Immunity**

The district court granted the motion to dismiss the unlawful entry claim against Officers Carelli, Hart, Demchuk, and Sergeants Fottrell and Martin on the grounds of qualitied immunity.[16] We review that decision *de novo*. *See Charles W. v. Maul*, 214 F.3d 350, 356 (2d Cir. 2000); *Connell v. Signoracci*, 153 F.3d 74, 80 (2d Cir. 1998).[17] Qualified immunity is available to officials so long as their actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether defendants enjoy qualified immunity, "we consider

---

[16] Appellant does not appeal the grant of the motion to dismiss the unlawful entry claim as to Officers Markowski and Love and Lieutenant Spencer.

[17] We address Defendant Martin's assertion that he has qualified immunity from the claim for use of excessive force in Part II.A., *infra*.

the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014). The plaintiffs are not required to cite a case "directly on point." *Id.* at 230 (internal quotation marks omitted); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (finding that whether the very action in question has not previously been held unlawful is not determinative); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ( "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). However, "in the light of pre-existing law the unlawfulness must be apparent." *Id.* at 739 (internal quotation marks omitted).

To be sure, qualified immunity should be resolved "at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotation marks omitted). But there is an obvious, if rarely expressed, corollary to that principle: The immunity question cannot be resolved *before* the "earliest possible stage," *id.*, i.e., prior to ascertainment of the truth of the plausible factual allegations on which a finding of qualified immunity is premised. And since qualified immunity is an affirmative defense that is typically asserted in an answer, *see, e.g.*, *Harlow*, 457 U.S. at 815, as a general rule, "the defense of qualified

28

immunity cannot support the grant of a [Rule] 12(b)(6) motion," *Green v. Maraio*,

722 F.2d 1013, 1018 (2d Cir. 1983). We have explained that:

> a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route. Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears [that the alleged facts, if true, plausibly state a claim] that would entitle him to relief. Thus, the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense.

*McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004) (citations, internal quotation

marks, and alterations omitted).

Thus, a qualified immunity defense presented on a Rule 12(b)(6) motion

"faces a formidable hurdle . . . and is usually not successful." *Field Day, LLC v.*

*County of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006) (internal quotation marks

omitted).[18] Otherwise, plaintiffs alleging a violation of their constitutional rights

would face a heightened pleading standard under which they must plead not only

facts sufficient to make out their claim but also additional facts to defeat an

assertion of qualified immunity. *See Castro v. United States*, 34 F.3d 106, 111 (2d Cir.

1994) ("[Q]ualified immunity is an affirmative defense that a defendant has the

---

[18] We see no reason to think the hurdle to be materially less formidable post- *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

burden of pleading in his answer. A plaintiff, in order to state a claim of constitutional violation, need not plead facts showing the absence of such a defense." (internal citations omitted)). Put another way, advancing qualified immunity as grounds for a motion to dismiss is almost always a procedural mismatch. *See Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, *J.*, concurring).

The defendants do not clear this high bar. The law was clearly established at the time of entry that a warrantless entry into a private dwelling, absent exigent circumstances, is unlawful. *See, e.g., Payton v. New York*, 445 U.S. 573, 586 (1980) ("It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."). It was further established that a warrantless entry in response to a medical concern is unlawful absent probable cause to believe that a person inside is in immediate danger. *Tierney*, 133 F.3d at 196–97; *Hurlman*, 927 F.2d at 81. The officers were responding to a 911 call at a location that was the source of prior EDP calls. They could hear Chamberlain yelling things that indicated that he was in psychological distress, but they had no information suggesting he was in physical danger. As pleaded, the Life Aid operator informed the dispatcher that Chamberlain's medical alert

had been triggered accidentally. Chamberlain repeatedly told the officers that he did not call the police. Both Chamberlain and the Life Alert operator told the officers that Chamberlain was not in need of medical assistance. Further, despite now asserting that Chamberlain needed urgent medical aid, the officers ultimately opened the apartment door bearing no medical equipment but instead with a Taser and guns drawn.

It was also clearly established at the moment of entry that an uncorroborated 911 call—like the initial, later withdrawn, call to police by Life Aid—reporting that a mentally ill person was in distress is insufficient support for probable cause to believe there is a medical exigency. *Kerman*, 261 F.3d at 236 (constitutional violation found where the defendants relied on an "anonymous 911 call to justify an invasion of the sanctity of a private dwelling" (internal quotation mark and alterations omitted));[19] *Keeton v. Metro. Gov't of Nashville & Davidson Cty.*, 228 F.

---

[19] In *Kerman*, we ultimately affirmed the district court's grant of qualified immunity on a motion for summary judgment because we could not "say that for qualified immunity purposes the current law governing the warrantless entry in this case was clearly established by October 1995." 261 F.3d at 237. Here, however, the events giving rise to Appellant's complaint took place in November 2011, long after this right was clearly established by *Kerman* and its progeny. *See United States v. Sikut*, 488 F. Supp. 2d 291, 308–10 (W.D.N.Y. 2007) (warrantless entry violated Fourth Amendment where neighbor's 911 call was not "unambiguously indicative" of an emergency); *see also Mizrahi v. City of New York*, No. 15 Civ. 6084 (ARR) (LB), 2018 WL 3848917 (E.D.N.Y. Aug. 13, 2018) (denying

App'x 522, 525 (6th Cir. 2007) (non-precedential opinion) (finding on motion to dismiss "[w]here the police enter a home without a warrant and with no justification beyond an unverified, unreliable report that the occupant of the home is 'depressed,' the constitutional violation is obvious"). Here, not only was the emergency call from Chamberlain's apartment uncorroborated by Chamberlain or anyone else with firsthand knowledge of his condition, *Kerman*, 261 F.3d at 238, it was later expressly retracted by the Life Aid operator who initiated the call to police. Viewed in the light most favorable to Appellant, therefore, the facts as alleged are sufficient to overcome the defendants' assertion of a qualified immunity defense, at least until further facts are submitted on a motion for summary judgment or at trial.

Police perform dangerous and challenging work for the public benefit, often under perilous circumstances. Qualified immunity reflects the recognition that, in order to ensure public safety, police officers require sufficient protection to enable them to perform their duties without fear of unwarranted private litigation. Judge Learned Hand may have, as is so often the case, said it best:

---

summary judgment to defendants where 911 caller claimed plaintiff was suicidal, but police did not verify plaintiff was in danger).

> [T]o submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties. Again and again the public interest calls for action which may turn out to be founded on a mistake, in the face of which an official may later find himself hard put to it to satisfy a jury of his good faith.

*Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949).[20] And it may well be that the defendant police officers in this case are ultimately entitled to immunity, indeed, at the "earliest possible stage in litigation." *Pearson*, 555 U.S. at 232. But today is not that day. *See Oliver Sch., Inc. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991) ("[I]t may be that . . . [the plaintiff] will ultimately be unable to prevail because of [the qualified immunity] defense," but "[t]hat possibility is not a valid basis" for granting a motion to dismiss).

Here, Appellant has plausibly alleged that the officers' warrantless entry into Chamberlain's home was not justified by exigent circumstances and was,

---

[20] *See also Amore v. Novarro*, in which the Court, after referring to *Gregoire*, observed:

> We have since [*Gregoire*] reiterated our concern that for the public benefit, public officials be able to perform their duties unflinchingly and without constant dread of retaliation. And the Supreme Court has described the "central purpose" of qualified immunity as preventing threats of liability that would be "potentially disabling" to officials.

624 F.3d 522, 530 (2d Cir. 2010) (citing *Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001) and then quoting *Elder v. Holloway*, 510 U.S. 510, 514 (1994)).

therefore, a violation of his clearly established rights under the Fourth Amendment. Since the officers' qualified immunity defense is not clearly established by allegations in the Amended Complaint as augmented by the relevant recordings, *McKenna*, 386 F.3d at 436, the district court erred in applying it in the context of the Rule 12(b)(6) motion to dismiss. We therefore vacate the judgment of the district court with respect to the qualified immunity defense asserted by defendants Carelli, Hart, Demchuk, Fottrell, and Martin related to the unlawful entry claims.

## II.

### Excessive Force, Supervisory Liability, and *Monell* Claims

Appellant also challenges the district court's grant of summary judgment in favor of defendants on the excessive force claim asserted against Sergeant Martin,[21] the supervisory liability claims against Officers Fottrell and Martin, and

---

[21] In his Amended Complaint, Appellant alleged that Sergeant Fottrell, Sergeant Martin, and Officer Carelli applied excessive force in their use of a Taser, beanbag shotgun, and handgun, respectively. The district court granted Fottrell's motion to dismiss the excessive force claim for his initial discharge of the Taser, and later dismissed the excessive force claim against him for the second use of the Taser on summary judgment. Appellant does not appeal the district court's decisions with respect to either excessive force claim against Sergeant Fottrell. The district court *denied* the motion to dismiss the claim for use of *lethal* force by Officer Carelli, the defendant who shot and killed Chamberlain. *Chamberlain*, 986 F. Supp. 2d at 386. Carelli later prevailed at a jury trial. Appellant does not allege that defendants Hart, Love, Demchuk, Markowski, and

the *Monell* claim against the City. We review *de novo* a grant of summary judgment, viewing all of the evidence and drawing all inferences in the non-moving party's favor. *See Brown v. City of New York*, 862 F.3d 182, 189 (2d Cir. 2017). Summary judgment is warranted only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A. Excessive Force Claim Against Martin

Our review of Appellant's excessive force claim against Officer Martin is limited to whether the district court correctly concluded on a motion to dismiss, and reaffirmed on a motion for summary judgment, that Officer Martin, the defendant who deployed beanbag shots against Chamberlain, was entitled to qualified immunity with respect to his use of non-lethal force.

The Fourth Amendment prohibits the use of excessive force in police-citizen interactions. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Determining whether force was reasonable requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the

---

Spencer engaged in direct applications of force, and he does not appeal the district court's grant of their motion to dismiss those claims.

countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). Albeit in a different context, the Supreme Court has identified factors to be balanced in this analysis, some of which are inapposite but several of which are relevant to Appellant's case. This balancing "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* When analyzing an excessive force claim, the key question we must ask is "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (internal quotation marks omitted); *see also Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546 (2017) ("The operative question in excessive force cases is whether the totality of the circumstances justifies a particular sort of search or seizure." (internal quotation marks and alterations omitted)).

That said, because we have vacated the district court's grant of defendants' motion to dismiss the claim for unlawful warrantless entry, we also vacate the court's determination that Officer Martin was entitled to qualified immunity for

his use of the beanbag shotgun. It is not clear to us whether, and if so, to what extent, the district court's determination that Appellant failed to plead a cause of action for unlawful entry—a decision we now reverse—affected the court's analysis of the legitimacy of the police actions as they entered the apartment. *See* Sp. App'x 22 (describing the "hour-long standoff" and later finding that "a reasonable officer could have concluded that use of non-lethal force was necessary in the circumstances"). We therefore remand the excessive force claim against Officer Martin so the district court may determine in the first instance at the appropriate stage of the proceedings whether Officer Martin is entitled to qualified immunity for his use of the beanbag shotgun in light of the totality of circumstances, including the officers' warrantless entry and the justifications therefor, which must be further developed. The officers' unlawful entry into Chamberlain's apartment, if borne out by proven facts, may affect the balancing of factors bearing on whether the officers' use of force was objectively unreasonable under the circumstances. *See Mendez*, 137 S.Ct. at 1547 n.1 (declining to address the question of whether "unreasonable police conduct prior to the use of force that foreseeably created the need to use it" is a relevant factor in an

excessive force analysis because that question was raised after certiorari was granted).

## B. Supervisory Liability Claims

Appellant asserts that the district court erred when granting summary judgment on his supervisory liability claims because the evidence demonstrates that Officers Martin and Fottrell failed to communicate with each other as to how to proceed when Chamberlain refused to open his door and failed to develop a plan for what actions the officers would take once Chamberlain's door was removed. Section 1983 imposes liability only on supervising officials for "grossly negligent supervision of subordinates who committed a [constitutional] violation." *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003). We have defined gross negligence as conduct that demonstrates a "heedless indifference to consequences to another," meaning the "kind of conduct . . . where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk." *Bryant v. Maffucci*, 923 F.2d 979, 985 (2d Cir. 1991). To succeed on a supervisory liability claim, a plaintiff must "show an affirmative causal link

between the supervisor's inaction and [the plaintiff's] injury." *Poe v. Leonard*, 282 F.3d 123, 140 (2002).

As with the excessive force claim against Martin, we cannot determine whether, and if so to what extent, the district court's dismissal of Appellant's unlawful entry claim colored the court's analysis of the alleged actions of the supervisors. We note that the court dismissed as a matter of law part of the supervisor liability claim against Officer Martin on this basis. Sp. App'x 37 ("No constitutional violation occurred by virtue of the police entry into Chamberlain's apartment, and Sergeant Martin cannot be held liable on a theory of supervisory liability for those actions."). We therefore vacate the district court's grant of summary judgment in favor of defendants Fottrell and Martin on Appellant's supervisory liability claims and remand to the district court so it may determine in the first instance, presumably on motion for summary judgment, whether there is a genuine dispute of material fact with respect to these claims particularly in light of the open question of whether the officers' warrantless entry into Chamberlain's apartment was constitutional.

**C. *Monell* Claims**

Appellant further appeals the district court's grant of summary judgment in favor of the City on his *Monell* claim, s*ee Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), arguing that White Plains' EDP policy is unconstitutional because it failed to include guidance for removing EDPs who have barricaded themselves inside their homes. A municipality may be held liable under § 1983 for constitutional violations arising out of its inadequate training of municipal employees, "only where the failure to train amounts to deliberate indifference to the rights" of an individual injured by a municipal employee. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). "Without notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

It is undisputed that at the police academy and while working in-service, White Plains police officers receive training on how to interact with EDPs and that officers can receive extra EDP training from NYPD-run classes at John Jay College of Criminal Justice. It is true that the officers likely would have benefitted from a written policy on how to approach barricaded EDPs. Inasmuch as the officers did receive training, however, the City's failure to adopt written policies or procedures

does not demonstrate a deliberate indifference on the part of the City necessary to find *Monell* liability.

## III.

## Evidentiary Issues

Challenging the jury verdict in favor of Officer Carelli, Appellant argues that the district court erred in two of its evidentiary rulings. First, he challenges the district court's decision to limit the use of evidence that Carelli displayed his gun while outside Chamberlain's door. Second, he contests the district court's decision precluding the use of Chamberlain's medical records showing that Chamberlain was in poor medical condition. We review those rulings for abuse of discretion, and they are "to be sustained unless manifestly erroneous." *Lore v. City of Syracuse*, 670 F.3d 127, 155 (2d Cir. 2012) (internal quotation marks omitted).

## A. Evidence that Carelli Displayed his Gun

We begin with Carelli's actions prior to the removal of Chamberlain's door. In a motion *in limine*, Appellant asserted that he should be permitted to argue at trial that Carelli's "act of displaying his gun" while outside Chamberlain's apartment constituted assault in that it placed Chamberlain in fear of imminent

harm. Appellant's Br. 57. On appeal, Appellant asserts that the district court exceeded the bounds of its discretion by deciding that the evidence of Carelli's actions outside Chamberlain's door could be used only as context for what happened when Carelli entered and not as evidence of an assault in and of itself.[22] We find no abuse of discretion.

Under Federal Rule of Evidence 403, evidence that is relevant and otherwise admissible may nonetheless be excluded "if its probative value is substantially outweighed by a danger of . . . confusing the issues, misleading the jury, . . . [or] wasting time." Fed. R. Evid. 403. "The court's balancing analysis under Rule 403 is reviewable under an abuse-of-discretion standard, and its resulting decision to admit or exclude evidence will not be overturned unless we conclude that the court acted arbitrarily or irrationally." *United States v. Thai*, 29 F.3d 785, 813 (2d Cir. 1994).

Appellant points to a Taser video, in which the viewer can see a glimpse of Carelli's gun barrel pointed at the door, which is in turn slightly cracked open in part thanks to the Halligan tool. The problem, however, is that where Carelli is

---

[22] Appellant did not assert this theory of his assault claim in his complaint. We affirm on the merits and therefore we decline to address whether—and Defendants do not argue that—Chamberlain has improperly constructively amended his Complaint.

standing in relation to where the door is slightly open would make it impossible for Chamberlain to see Carelli's raised gun barrel. While the evidence does show that Carelli briefly raised the barrel of his gun while outside the door, the same screenshot confirms the fact that Chamberlain could not have seen Carelli at that moment because of the limited angle of view where the door was cracked open. The evidence also showed that Chamberlain was yelling "I know I'm gonna get hurt. I know that. I know I'm gonna get hurt" and "[t]hey'll probably kill me," J. App'x 234–35, yet those same remarks which indicate Chamberlain's belief that he was going to be hurt, prompted by the officers banging on his door and asking him to open it, also demonstrated a belief that any harm was not so imminent as to be satisfactory proof of an assault claim. *See United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993) ("An assault is an intentional placing of another person in fear of imminent harmful or offensive contact." (internal quotation marks omitted)). The district court correctly determined that:

> [U]nder [Rule] 403, . . . the risks of the jury misusing the evidence of everything that happened before the door opened is great. It would not only be confusing and a waste of time to have a lot of evidence about what happened before the door came down . . . . [I]t would, I think, create a strong risk of prejudice in the form of the fact that a juror who wonders about the door coming down or other things that happened in the hallway might well reach a conclusion based on an improper basis.

Sp. App'x 164-65. In sum, on the record before us, the district court did not abuse

its discretion by limiting the evidence of Carelli's actions outside the apartment before the door was removed.[23]

## B. Medical Records

Finally, Appellants argue on appeal that the district court erred by excluding evidence of Chamberlain's medical conditions—specifically, the introduction of his Veterans Affairs medical records. We disagree. The records consisted of notes and observations of Chamberlain's treating physicians made in the days and weeks before his death. Those records included notations that Chamberlain suffered from chronic obstructive pulmonary disease, hypertension, hearing problems, and obesity.

Long after the close of discovery, in a motion *in limine*, Appellant sought to introduce these records to discredit evidence suggesting that after Chamberlain was knocked to the ground by the beanbag shotgun he got back up and started running towards the officers. On appeal, Appellant asserts that the records were

---

[23] In a footnote in his opening brief, Appellant also asserts that "the assault claims against Martin and Fottrell should have gone to the jury because the elements were satisfied and there were genuine factual disputes." Appellant's Br. 58 n.12. We do not address that argument because that is not enough to raise the issue on appeal. *See Diesel v. Town of Lewisboro*, 232 F.3d 92, 110 (2d Cir. 2000) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review." (internal quotation marks omitted)).

relevant to assist the jury "in weighing the credibility of the defendants' testimony with respect to the herculean physical actions they alleged Chamberlain undertook; actions which supposedly necessitated the overwhelming use of force, including deadly force, against him." Appellant's Br. 62. To be sure, the medical records, with appropriate testimony explaining them, could have been probative and useful in this case. The problem, as the district court explained, is that without a physician testifying about what those conditions were—and the effect they would have had on Chamberlain's physical health and ability to act in the manner that the officers claimed he did—the records would have required the jury to speculate as to the effect those conditions had on Chamberlain. Without that testimony, therefore, those records were not admissible because they did not have any tendency to make the officers' testimony about Chamberlain's actions that morning "more or less probable" than the officers' testimony would be "without the evidence." Fed. R. Evid. 401.

Moreover, Appellant could not produce expert testimony regarding Chamberlain's medical records because of his counsel's failure to comply with the disclosure requirements of Federal Rule of Civil Procedure Rule 26(a). Under Rule 26(a)(2), parties must timely disclose the identity of witnesses who will present

expert testimony pursuant to Federal Rules of Evidence 702, 703, or 705. If a party

fails to identify a witness in compliance with Rule 26(a), "the party is not allowed

to use that information or witness to supply evidence on a motion, at a hearing, or

at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ.

P. 37(c)(1). When evaluating whether testimony should be precluded under Rule

37 for failure to disclose under Rule 26(a), we consider four factors:

> (1) the party's explanation for the failure to comply with the discovery
> order; (2) the importance of the testimony of the precluded witness; (3) the
> prejudice suffered by the opposing party as a result of having to prepare to
> meet the new testimony; and (4) the possibility of a continuance.

*Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997).

The record indicates that the failure to disclose was likely an oversight by

Appellant's counsel. While expert testimony might have proven helpful to the

case, even Appellant's counsel was unsure if a physician would have an opinion

that favored Appellant's theory. Moreover, defendants would have been

prejudiced because they had not been provided with an opportunity to depose any

doctor Appellant called to testify, nor would they have time to find an opposing

expert who would potentially contradict Chamberlain's doctor. As Appellant's

request came one week before trial and after discovery had been concluded, a

continuance would further protract the case at a point when all parties were

otherwise prepared to proceed to trial. We conclude the district court did not exceed the bounds of its discretion in precluding the admission of Chamberlain's medical records.

**CONCLUSION**

By our foregoing recitation of factual allegations pleaded by Appellant Chamberlain, we do not mean to express or imply a view as to the correct ultimate outcome of this *litigation*; precisely to the contrary, we do not think any court could properly do so at this juncture. As set forth in detail above, we reiterate that the case as pleaded is ample to withstand the motion to dismiss the Complaint. There was indeed more evidentiary material before the district court than is common at the motion to dismiss stage of the proceedings: specifically, the audio and video recordings of the incident properly considered by the district court as "integral to the Complaint." *Chamberlain*, 986 F. Supp. 2d at 374 n.1. Thus, the plausible allegations contained in the Complaint, augmented by the other material properly before the district court, were more than adequate to survive the defendants' motion to dismiss.

It may well be that on remand, based on all the relevant evidence obtained and developed by the parties and submitted to the court after discovery, summary

judgment for the defendants under Federal Rule of Civil Procedure 56 will be appropriate. *See McKenna*, 386 F.3d at 436 (unlike the assertion of a qualified immunity defense on a motion to dismiss, "with a motion for summary judgment adequately supported by affidavits, the party opposing the motion cannot rely on allegations in the complaint, but must counter the movant's affidavits with specific facts showing the existence of genuine issues warranting a trial"). Discovery and further briefing, moreover, might enable the district court to make a decision that includes answers to many open questions. *See Castro*, 34 F.3d at 111–12 (noting that "some limited and carefully tailored discovery may be needed before summary judgment will be appropriate" on qualified immunity). For example: What factors and reasoning supported the officers' decision to force entry when they did rather than seeking to de-escalate the situation before doing so? Why were Chamberlain's close relatives, one of whom was on site, not employed by the police in an attempt to resolve the confrontation without bloodshed? What was the significance, if any, of the crude epithets (if ultimately proven to have in fact been uttered) used by the police at or about Chamberlain before their fatal forced entry? Why did the officers enter the apartment with a Taser, handguns, and a beanbag shotgun if they were there to administer emergency medical aid? And, in

broader focus, why did the police officers, after the various events of the morning of November 19, 2011, decide they had to break down the door and enter Chamberlain's home?

For the reasons set out above, we conclude that: (1) Appellant pleaded a plausible claim for unlawful entry by defendants Carelli, Hart, Demchuk, Fottrell, and Martin in violation of 42 U.S.C. § 1983; (2) the grant of summary judgment in favor of defendant Martin with respect to the excessive force claim and in favor of defendants Fottrell and Martin with respect to the supervisory liability claims should be reconsidered and is therefore vacated, and those claims are remanded to the district court; (3) Appellant's *Monell* claim against the City was properly dismissed on summary judgment; and (4) the district court acted within its discretion when limiting introduction of what was alleged to be evidence of assault by Officer Carelli and excluding from evidence Chamberlain's medical records. We therefore **AFFIRM** in part and **VACATE** in part the judgment of the district court, and **REMAND** the matter to the district court for further proceedings with respect to Appellant's claim for unlawful entry, excessive force, and supervisory liability in violation of § 1983 and the officers' qualified immunity

defenses, which may include further discovery, motion practice should it become

justified, and an eventual trial.